MALCOLM TERRY, Respondent, *v.* DAIRYMEN'S LEAGUE CO-OPERATIVE ASSOCIATION, Appellant.

Third Department, November 16, 1956.

*George Marcus* and *Frank B. Lent* for appellant.

*Francis R. Paternoster* for respondent.

HALPERN, J.   The plaintiff has recovered a substantial judgment for damages upon the theory that the defendant maliciously induced the breach of trucking contracts which had been entered into between the plaintiff and a number of dairy farmers.

This case has been tried twice.   A verdict in favor of the plaintiff upon the first trial was set aside by the Trial Justice on the ground that it was against the weight of the evidence. The Justice presiding at the second trial indicated that he, too, had been inclined to set aside the verdict but, in view of the fact that two juries had arrived at the same result, he had decided to allow the verdict to stand.   We have concluded that the judgment should be reversed and the complaint dismissed.

The plaintiff was engaged in the business of hauling milk from various dairy farms in the vicinity of Downsville, New York, to the defendant's milk plant at Margaretville, New York. The defendant, as its name indicates, is a co-operative association of dairy farmers.   The farmers with whom the plaintiff had contracted for trucking were all members of the defendant association.   Prior to 1949, the defendant's plant had been located at Downsville, New York, and the plaintiff was one of several truckers who hauled milk to the plant for farmers in that area.   Because of the condemnation of many farms by the New York City Board of Water Supply, the number of dairy farms operating in the area was greatly reduced and the defendant decided to close the Downsville plant and to transfer the patronage of the farmers in that area to its Margaretville plant, about 20 miles away.   There obviously was not enough business to sustain several truckers and the defendant selected the plaintiff and one Williams as the two truckers who would serve the farmers in the Downsville area and bring their milk to Margaretville.   While the defendant had operated its plant at Downsville, the cost of hauling the milk to the plant had been borne wholly by the farmers.   The truckers' charges, about 15 cents per hundredweight, had been deducted by the defendant from the amounts owing to the farmers and had been paid over by it to the truckers.   Because of the longer haul to Margaretville, the defendant agreed to contribute about 5 cents per hundredweight during the summer months and 10 cents per hundredweight during the winter months, as an additional payment to the truckers.   The contract of transportation was in each instance made orally between the farmer and the trucker but, since it was not economically feasible for a trucker to engage in the business of transporting milk unless he had a substantial number of customers along the same route, the farmers had to act co-operatively in arranging for the serv-

ices of a trucker. The farmers, as members of the defendant, naturally looked to the defendant to make the arrangements for the trucking. As an executive of the defendant testified, the defendant regarded it as part of its responsibility to see to it that suitable trucking service was made available, even though under its contracts with the farmers for the purchase of milk, it was the legal obligation of the farmers to deliver the milk to the plant.

It thus appears that the defendant acted as the agent of the farmers in making arrangements for the trucking, subject to ratification or adoption of the arrangements by the individual farmers. The defendant had an interest in seeing to it that satisfactory arrangements were made, both in order to assure a steady flow of milk at its plant and in order to protect the farmers as its members. In the special case of the transportation to the Margaretville plant, the defendant had an additional interest growing out of the fact that it contributed a subsidy for part of the cost of the transportation.

In 1949, when the plaintiff started to haul milk to the Margaretville plant, he had about 23 customers on his route. The New York City water supply project continued to absorb dairy farms and, in the ensuing years, several of the dairy farmers on the plaintiff's route ceased to operate, with the result that in 1953 the plaintiff had only 13 customers left. The plaintiff contended that this volume of business did not produce a sufficient income at the rates currently paid. He complained about this from time to time to his farmer customers and to the officials of the defendant. The situation came to a head late in 1953. On Wednesday, November 4, the plaintiff telephoned to one Clark, a member of the board of directors of the defendant, who resided in the vicinity, and took the matter up with him. There is a controversy as to the exact content of the conversation. The plaintiff testified that he demanded more money and stated that he was losing money at the current rates but he denied that he threatened to quit if more money was not forthcoming. On the other hand, Clark testified that the plaintiff told him that he would quit if the defendant did not increase the amount of its payment. According to Clark, the plaintiff said that he would give the defendant until the first of the following week to provide additional money and, if it failed to do so, he would quit hauling the milk. The following Friday, November 6, a conference was held at the office of the defendant at which its division representative, its local field representative and the manager of the milk plant were all present. The plaintiff repeated his demands, but the defendant's representatives told him that they

could not pay him any more money, and they pointed out that Williams, the other trucker, was willing to continue at the agreed rates. Here again, there is a dispute as to whether the plaintiff gave notice of his intention to quit. The plaintiff denies that he did but the defendant claims that the plaintiff stated unequivocally that, if more money was not forthcoming, he would cease to haul the milk on the following Monday. According to the defendant's version of the conference, the plaintiff was repeatedly told that the defendant could not pay any more and that the farmers could not be expected to pay any more and that other arrangements would have to be made if the plaintiff was unwilling to continue at the current rates. Immediately after the conclusion of the conference, the defendant's field representative and its plant manager made arrangements with Williams to take over the plaintiff's route as well as to carry on his own route and they then notified all the farmers whom they were able to find at home, of the change in the arrangements. According to their testimony, they advised the farmers that they were, of course, free to make any trucking arrangements that they wished but that Williams would be available to haul the milk after Monday, if they wished to have him do so. Practically all the farmers whom they interviewed, constituting a majority of the farmers on the plaintiff's route, acquiesced in the change.

Accordingly, on Monday, November 9, after the plaintiff had delivered a truckload of milk at the defendant's plant, the defendant declined to return the empty milk cans to the plaintiff but turned them over to Williams who, in regular course, returned them to the farmers. Thereafter, the farmers continued to ship their milk by Williams' truck, without protest or objection. The plaintiff then brought this action for damages against the defendant.

It is undisputed that the oral contracts between the plaintiff and the farmers were terminable at will and that the agreement of the defendant to pay a subsidy was also terminable at will. The plaintiff, nevertheless, characterized his action as an action for damages for maliciously inducing the *breach* of the contracts between himself and the farmers. Since the contracts were terminable at will, the discontinuance of the plaintiff's services, however induced, could not constitute a breach of contract. The action must, therefore, be regarded as one for damages for inducing the discontinuance of business relations rather than as one for the inducing of a breach of contract. It is settled that such an action can be maintained only upon a showing that the defendant acted solely out of a

malicious desire to injure the plaintiff, without any expectation of furthering its own business interests (*Reinforce, Inc. v. Birney*, 308 N. Y. 164; *Beardsley* v. *Kilmer*, 236 N. Y. 80). The trial court correctly charged the jury in accordance with this settled principle, using language adopted from the opinions in the cited cases:

" And the action is brought upon the theory that this defendant maliciously and without legal or social justification caused these producers to discontinue the plaintiff's services. If the defendant deprived the plaintiff of his employment by means not in themselves unlawful, by acts not in themselves unlawful, have [sic] any proper purpose to serve, they are not liable for any damage they caused. The genesis which will make a lawful act unlawful must be a malicious one, unmixed with any other, and exclusively directed to injury and damage of another.

" In other words it is incumbent upon the plaintiff to establish to your satisfaction that the action of the defendant was without legal or social justification; that their action was not motivated by a proper desire."

No exception was taken to the charge and there was no request to charge. The jury returned a verdict in favor of the plaintiff in the amount of $4,357.

It is virtually undisputed that the verdict cannot be allowed to stand upon the theory upon which the case was submitted to the jury. It is clear beyond question that the defendant did not act out of " disinterested malevolence ", the epigrammatic phrase coined by Justice HOLMES in *American Bank & Trust Co.* v. *Federal Reserve Bank* (256 U. S. 350, 358). (See *Reinforce, Inc.*, v. *Birney, supra*, p. 170.) Indeed upon the oral argument, the plaintiff's counsel disavowed any claim that the defendant had acted only to injure the plaintiff, without any intention to further its own interests.

Whether we take the plaintiff's version of the conference of November. 6 or the defendant's version, it is clear that the defendant acted for the legitimate purpose of protecting and furthering its own economic interests and those of its members. Under the defendant's version, which we believe to be the one supported by the weight of the credible testimony, the plaintiff gave notice at the conference of his intention to quit on the following Monday, if the defendant did not increase the rate of its payments to him; the defendant then naturally proceeded to make other arrangements so that trucking services would be available to its farmer members and so that the flow of milk to its plant would be maintained without interruption. Under this version of the transaction, the termination of the

contracts was brought about by the plaintiff himself and not by any inducement by the defendant and no tort of any kind could be charged to the defendant. The defendant's version was supported by the testimony of several farmers who testified that the plaintiff had told them shortly before the conference of November 6 that he intended to quit if the defendant would not pay him more money; that he could make more money doing other things and that he would not haul any more milk if his pay was not increased. The plaintiff's version of the conference rested solely upon his own testimony and its credibility was seriously impaired by his admission that he had repeatedly demanded more money and had left the conference without having withdrawn the demand. The jury nevertheless chose to accept the plaintiff's version and, for the purpose of determining whether the complaint should be dismissed, we, too, must accept that version and give the plaintiff the benefit of every reasonable inference from the proof. Even upon that basis, we find that no case was made out against the defendant. The most that could be said, under plaintiff's version of the transaction, was that the defendant had decided, in view of the fact that the volume of business from the Downsville area was falling off and that the plaintiff was demanding a higher rate of pay, that it would be best to concentrate the trucking from that area in the hands of a single trucker who would be able to make a living out of the total volume at the current rates and that it accordingly decided to arrange to have Williams take over all the business. Even upon that hypothesis, the decision by the defendant was a decision taken in the ordinary course of business, designed to serve its interests and those of its farmer members. The defendant was dealing with a highly perishable product and it was important that dependable trucking arrangements should be made, which would not be subject to the constant threat of disruption. In shifting the business to Williams, the defendant merely sought to establish a stable arrangement under which it would be assured that the trucking would continue to be done, free from persistent pressure for increased compensation.

As has been indicated, the plaintiff's counsel recognizes, upon this appeal, that the defendant's action was motivated, at least in part, by a desire to serve its own interests and those of its members and that therefore it could not be found that the defendant's action had its genesis solely in a desire to injure the plaintiff unmixed with any other motive. His principal contention seems to be that the presence of a business motive was immaterial; that the defendant's desire to serve

its business interests did not justify it in intentionally causing the termination of the plaintiff's contracts. It is true that economic self-interest does not ordinarily afford a justification for inducing the breach of a contract for a definite term but this rule has no application to the inducing of the termination of a contract which is terminable at will.

The plaintiff falls into the fallacy of assuming that, since a contract terminable at will may be the subject of an action in tort for damages for inducing its termination, the same rules of law are applicable to such a contract as are applicable to a contract having a definite term. But the rules with respect to the scope of the defendant's privilege are wholly different in the two classes of cases. The fact that the contract is terminable at will greatly broadens the scope of the defendant's privilege. The privilege in such a case is substantially the same as the privilege of inducing third persons not to enter into new business relations with the plaintiff. (Restatement, Torts, § 766 and comment c to that section.) Under the principles of the free enterprise system, that privilege is a very broad one and it is forfeited only when the defendant's action, otherwise lawful, is intended solely to injure the plaintiff without any expectation of social or economic advantage (*Beardsley* v. *Kilmer*, 236 N. Y. 80). On the other hand, the furthering of one's business interests does not ordinarily justify the inducing of the breach of a contract for a definite term. Thus, for example, one may not with impunity seek to gain new customers by inducing them to breach their existing contracts with others (*Campbell* v. *Gates*, 236 N. Y. 457) but, in the free play of competition, one may seek to win for himself the patronage of the customers of others, by inducing them to discontinue their existing business relations, provided that they are terminable at will. (Restatement, Torts, § 768; Prosser on Torts [2d ed.], pp. 735–738; *Coleman & Morris* v. *Pisciotta*, 279 App. Div. 656).

Dean Prosser suggests in his illuminating work that " So much more is allowed in the way of interference to further the defendant's own legitimate interests where the contract is subject to such termination, that contracts terminable at will might very well be placed in an intermediate classification of their own, half way between contracts for a definite term and the mere expectancy of prospective advantage " (Prosser on Torts [2d ed.], pp. 726–727; see, also, pp. 741–742). As has been noted above, the American Law Institute goes further and assimilates contracts terminable at will to a mere expectancy of future business relations, so far as the privilege of interfer-

ence is concerned (Restatement, Torts, § 766, and comment c to that section). But, whichever view is taken, it is clear that the conduct of the defendant, under the circumstances of this case, was privileged.

It thus appears that, under the theory upon which the case was submitted to the jury, the plaintiff failed to establish a cause of action and that the judgment should be reversed and the complaint dismissed.

There is a suggestion in the plaintiff's brief of another theory upon which a recovery might be sought, different from the theory upon which the case was submitted. The plaintiff's counsel points out that, according to the defendant's own evidence, when the representatives of the defendant called upon the farmers, after the conference of November 6, they told them that the plaintiff had quit and the plaintiff argues that, under his version of the conference of November 6, this statement was false. It is undoubtedly true that if one uses unlawful or improper means to bring about the termination of a contract which is terminable at will, he may be liable for the damages caused, even though his ultimate objective may have been the justifiable one of furthering his own business interests (Restatement, Torts, § 767, comment b). The use of a deliberate falsehood undoubtedly constitutes unlawful means (*Al Raschid* v. *News Syndicate Co.*, 265 N. Y. 1). But this theory cannot be injected into the case at this late stage to sustain a recovery by the plaintiff. It was not pleaded in the complaint nor was it covered by the plaintiff's motion made at the end of the plaintiff's case " to conform the pleadings to the proof ". The motion related to points specifically mentioned not relevant here. Furthermore, the proof that the defendant had told the farmers that the plaintiff had quit came in as part of the defendant's case and there was no such proof in the case at the time of the making of the motion to amend to conform to the proof. The three farmer witnesses, who had been called by the plaintiff to support his contention that he had not quit, all testified that they had not been told by the defendant that the plaintiff had quit.

Apart from this, the proof was insufficient to establish a case against the defendant upon the theory of the use of unlawful means. There was no showing that the defendant's agents acted in bad faith in making the statement that the plaintiff had quit or that they had any intention to deceive the farmers to whom the statement was made. The most that can be claimed on that score is that there was a misunderstanding and that the defendant's agents were mistaken in interpreting the plain-

tiff's remarks as indicating that he intended to quit. There is no liability in tort for a statement reasonably and honestly made even though it may turn out to be a mistaken one (cf. *Reno* v. *Bull*, 226 N. Y. 546; *Ultramares* v. *Touche*, 255 N. Y. 170). Furthermore, there was no showing upon the trial that the action of the farmers had been influenced by the defendant's statement that the plaintiff had quit and that, if they had been told merely that new trucking arrangements had been made in order to avoid the uncertainty created by plaintiff's demands for increased compensation, they would have insisted on continuing to use the plaintiff's services. Even if it is assumed that a few of the farmers would have taken that attitude, there was no showing that they would have provided a sufficient volume of business to enable the plaintiff to render the service at a profit to himself. In the absence of such a showing, it could not be found that the plaintiff had been damaged by the defendant's statement.

In any event, as we have seen, the plaintiff made no request to submit to the jury the theory of the use of unlawful means and he acquiesced in the charge which made the case turn wholly on the presence or absence of a legitimate business motive on the part of the defendant. This became the law of the case (*Owen* v. *Rochester-Penfield Bus Co.*, 304 N. Y. 457). The sufficiency of the plaintiff's case must be determined upon this appeal upon the basis of the theory upon which the case was tried and submitted.

The judgment appealed from should be reversed on the law and the facts and the complaint dismissed, without costs.

FOSTER, P. J., BERGAN, COON, and GIBSON, JJ., concur.

Judgment appealed from reversed, on the law and the facts, and the complaint dismissed, without costs.