PETROLEUM FOR CONTRACTORS, INC., Liquid Transportation Corp. and William J. Keahon and Charles Pretsch, Individually and as Tenants in Common, Plaintiffs,

v.

MOBIL OIL CORPORATION, Unlimited Petroleum, Inc. and Frank Rooney, Jr., Defendants.

No. 77 Civ. 3079 (WCC).

United States District Court, S. D. New York.

April 3, 1980.

OPINION AND ORDER

CONNER, District Judge.

Defendants Mobil Oil Corporation ("Mobil"), Unlimited Petroleum, Inc. ("Unlimited"), and Frank Rooney, Jr. ("Rooney") have moved for summary judgment on the claims alleged in plaintiffs' Third Amended Complaint in this 1977 antitrust case. Defendant Mobil has further moved for summary judgment on its counterclaims.

The facts of this case have been recited at length in two previous opinions by the Court, and will be related here only as necessary to clarify dispositions of the various motions. To identify the parties, plaintiff Petroleum for Contractors, Inc. ("PFC") was, until May 1977, a distributor of petroleum products (gasoline, diesel fuel and lubricants) to construction contractors in the New York City metropolitan area. During the same time period, plaintiff Liquid Transportation, Inc. ("LTC") leased tank trucks and other equipment to PFC for use in its distribution business. Plaintiffs William J. Keahon and Charles Pretsch were, until May 1977, shareholders, directors, officers and employees of PFC and LTC, and owners of the land, buildings and plant facilities leased to PFC for use in its business. Defendant Mobil is, and was during all relevant time periods, in the business, *inter alia*, of selling gasoline, diesel fuel and lubricants. Defendant Unlimited was engaged in the distribution of petroleum products to construction contractors in the New York metropolitan area from late November or early December 1975 through May 1977. Defendant Rooney was an employee of PFC from 1967 to late 1975, when he became an officer of Unlimited.

Berman, Paley, Goldstein & Berman, New York City, for plaintiffs; Jack S. Kannry, R. Bertil Peterson, New York City, of counsel.

Donovan, Leisure, Newton & Irvine, New York City, for defendant Mobil Oil Corp.; Sanford M. Litvack, Washington, D. C., Sue K. McDonnell, Osceola F. Thomas, Orin L. McCluskey, New York City, of counsel.

A. Conspiracy to Eliminate PFC as a Mobil Distributor

Defendants' motion for summary judgment with respect to plaintiffs' claim under Section 1 of the Sherman Act, 15 U.S.C. § 1, that Mobil, Unlimited and Rooney conspired to eliminate PFC as a Mobil distributor, is denied.

The essence of PFC's Section 1 claim is that Mobil, intending to achieve a monopoly position as supplier of lubrication products to the New York area construction contractor market, conspired with defendant Rooney to create defendant Unlimited as an exclusively Mobil distributor of gasoline, diesel fuel and lubricants, in a market previously dominated by PFC, a distributor which sold both Mobil and Chevron lubricants, and, at least before 1974, a certain number of additional brands of such products; to lure away construction contractor customers from PFC to Unlimited; and ultimately, to eliminate PFC as a distributor and competitor of Unlimited, thereby eliminating Chevron and any other potential lubrication product suppliers as competitors of Mobil in the market involved.

PFC charges that the objectives of the conspiracy have been furthered in a number of ways: threats by Mobil to PFC to cut off PFC's supplies of gasoline and diesel fuel if PFC did not confine its lubrication product distribution to Mobil product; representations by Mobil to PFC's customers that Mobil would cut off PFC's gasoline and diesel supplies and cease to provide Mobil's Engine Maintenance Through Progressive Analysis ("EM/PA") service to PFC customers; Mobil's assistance in establishing Unlimited through solicitation of false FEO–17 fuel requirements forms from prospective Unlimited customers, and Unlimited's filing of such false forms with the Federal Energy Administration, see Zielenski Affidavit; the shift of PFC's customers to Unlimited; the resulting elimination of intrabrand competition at the distributor level in the lubrication product market (since, plaintiff asserts, PFC's demise left Unlimited as exclusive Mobil dealer in that market); and the asserted elimination of any significant interbrand competition since, plaintiff asserts, PFC's demise removed the only significant distributor outlet for non-Mobil lubrication products, and caused Chevron, the major Mobil competitor at the supplier level, to drop out of the market, see Lanotte Affidavit.

Viewing the record on this summary judgment motion in the light most favorable to plaintiffs, the parties opposing summary judgment, as the Court is required to do, see *Poller v. Columbia Broadcasting System*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962), it appears at least possible to infer that an agreement violative of Section 1 existed among the several defendants. A grant of summary judgment on this issue is therefore not appropriate. *Poller, supra.*

B. Monopolization

PFC and its fellow plaintiffs have raised two claims under Section 2 of the Sherman Act, 15 U.S.C. § 2: that Mobil attempted individually, or conspired with defendants Rooney and Unlimited, to monopolize the area market for lubrication products; and that Mobil succeeded, following PFC's demise, in achieving a monopoly position in that market through its exclusive dealer arrangements with the remaining distributor, Unlimited.

In its previous opinion and order of June 29, 1978, this Court granted defendants' motion to dismiss plaintiffs' Section 2 claims for failing to specify Mobil's market share or otherwise indicate, in their monopoly claim, how Mobil possessed the ability to control prices or exclude competition, or, in their attempted monopolization claim, how Mobil was dangerously close to achieving such ability. In its Third Amended Complaint, plaintiffs rest their Section 2 claims, in part, on allegations that, in early 1974, Mobil possessed a 15% share of the New York area construction contractor lubrication product market through its sales to PFC (which, plaintiffs assert, controlled "virtually 100%" of the distributor market). Plaintiffs then allege that, by the end of 1974, Mobil's market share, measured by PFC's purchases of Mobil lubricants for resale, had increased to 95% as a result of Mobil's exclusive dealing demands in 1974, and Mobil's raising, in 1974, the minimum amount of lubrication product PFC was required to purchase under its general petroleum product contract with Mobil. Plain-

tiffs further allege that due to continued anticompetitive acts by Mobil, including Mobil's offer, in 1975, to purchase all of PFC's stock of Chevron lubricants, Mobil's market share through sales to PFC remained at 95% thereafter, while Chevron's market share dropped to and remained at 5%.

■ It now appears, following discovery, that the sales figures plaintiffs rely on are inaccurate, see discussion at part C, *infra*, and that, contrary to plaintiffs' assertions, PFC's contracts with Mobil were not modified at any time after 1973. However, it further appears that the remaining allegations in plaintiffs' Section 2 claim, when read in conjunction with facts alleged in plaintiffs' Section 1 distributor elimination claim, see part A, *supra*, might be read to state a conspiracy claim under Section 2, see *FLM Collision Parts v. Ford Motor Co.*, 543 F.2d 1019, 1030 (2d Cir. 1976), *cert. denied*, 429 U.S. 1097, 97 S.Ct. 1116, 51 L.Ed.2d 545 (1977); and might also be read to state an attempted monopoly or monopoly claim if also read in conjunction with certain other facts asserted generally in plaintiffs' complaint and specifically in plaintiffs' brief respecting Mobil's ability or near-ability to control the lubrication product market through its statutorily acquired control of the gasoline and diesel fuel market under the Emergency Petroleum Allocation Act of 1973 ("EPAA"), 15 U.S.C. § 751 *et seq.*, see *Berkey Photo v. Eastman Kodak Company*, 603 F.2d 263, 284 (2d Cir. 1979), *cert. denied*, 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980); *FLM Collision Parts, supra*, 543 F.2d at 1030. Finally, it does not appear that permitting plaintiffs to amend the Section 2 claims in their complaint to delete the now apparently inaccurate sales figures, and more explicitly assert a control-through-related-monopoly argument, would unduly prejudice defendants, since the underlying factual assertions necessary to such an amendment have been known to defendants since the conclusion of discovery. For the foregoing reasons, defendants' motion for summary judgment on plaintiffs' Section 2 claims is denied; plaintiffs may amend this count in their complaint to conform with their brief, as indicated.

## C. Exclusive Dealing and Tying

### 1. Section 3 Claims

Plaintiffs' Third Amended Complaint contains three counts alleging violations of Section 3 of the Clayton Act, 15 U.S.C. § 14. These counts are based on the following factual allegations: that Mobil inserted minimum purchase requirements for lubrication products in PFC's periodically-renewed contracts with Mobil for purchase of gasoline and diesel fuel; that Mobil unilaterally increased such contractual minimum purchase requirements in the period from 1974 to 1977; that Mobil threatened, from 1974 to 1977, to cut off or reduce PFC's gasoline and diesel fuel allocation if PFC did not deal exclusively in Mobil lubrication products; and that, as a result of these Mobil activities, PFC "had no choice . . other than to reluctantly" accede to Mobil's demands to exclude other lubrication product suppliers, so that PFC's sales of Mobil lubricants rose from 15% in early 1974 to 95% of PFC's lubricant sales by the end of 1974. The complaint further alleges that once PFC had taken such action, Chevron, PFC's other major supplier, was eliminated from this market (since PFC, or later, PFC and Unlimited, controlled virtually all of the resale market).

Plaintiffs then assert two claims based on these alleged facts. In Count 3, plaintiffs state that these Mobil activities constituted, during the period from 1974 to 1977, an illegal tying arrangement under Section 3, conditioning the sale of Mobil gas and diesel fuel on PFC's purchase of Mobil lubricants, which PFC bought reluctantly "so as to assure the continued availability of gas and diesel fuel." In Counts 4 and 5, plaintiffs allege that these activities also constituted, from 1974 to 1977, demands for an illegal exclusive dealing arrangement or requirements contract, which, when acceded to by PFC, "restricted plaintiff PFC from continuing to deal with and purchase from Chevron . . . and also excluded Chevron . . . from dealing with plaintiff PFC."

The record on summary judgment, however, does not support plaintiffs' allegations as to 1974–1977 sales figures or contractual modifications. Mobil states in its Local Rule 9(g) statement, and PFC does not deny in its Rule 9(g) statement, that PFC entered into no new contracts with Mobil after 1973 and did not modify prior contracts with Mobil after 1973. It thus appears that this type of alleged coercion did not occur from 1974 to 1977. Mobil further states in its affidavits and Rule 9(g) statement, which plaintiffs concede to be "generally" correct on this point, that PFC's lubrication product purchases from 1973 to 1977 were as follows:

| Year | PFC Lubricant Purchases from Mobil (gallons) | PFC's Mobil Purchases As Per Cent of PFC's Mobil and Chevron Purchases * |
|---|---|---|
| 1973 | 243,176 | 55.93%** |
| 1974 | 243,348 | 59.08% |
| 1975 | 25,545 | 18.69% |
| 1976 | 2,695 | 2.66% |
| 1977 | 5,950 | 21.00% |

\* These purchases represent 95% of PFC's lubricant purchases for resale until early 1974 and 100% thereafter. See Third Amended Complaint.

\*\* Corrected from 55.74% by McCreary Supplemental Affidavit.

There was thus no substantial increase in PFC's Mobil purchases in 1974 as a result of any alleged acts of coercion or tying, even if such coercive acts are assumed to have occurred; and at no point during these years did PFC purchase Mobil lubrication product exclusively.

In response, plaintiffs in their brief and affidavits in opposition to defendants' motion for summary judgment change their factual allegations somewhat. In his affidavit of November 26, 1979, plaintiff Keahon presents this new version of the facts: that PFC purchased little, if any, lubricants from Mobil during the period from April 1, 1970 to March 31, 1973; but that after that period, PFC purchased substantial quantities of Mobil lubricants; that Mobil coerced PFC into making such purchases by enforcing previously unenforced minimum lubrication purchase terms in PFC's contracts with Mobil, and by conditioning the sale of gasoline and diesel fuel on lubricant purchases. Keahon asserts that Mobil had the power to effect such coercion (1) because

Mobil controlled the petroleum product market, in 1972 and 1973 due to "international developments" which had caused an extreme shortage of petroleum products, and in late 1973 onward, due to enactment of the EPAA, and (2) due to the unique suitability of Mobil diesel fuel to the needs of the construction market from 1973 to 1977. Keahon further asserts that PFC's purchases of Mobil lubricants represented purchases of an unwanted product (a) because Mobil lubricants were more expensive than Chevron lubricants in the most desired package size, the five-gallon pail, (b) because Mobil delivered lubrication product late and often in ruptured containers, sometimes delivered poor quality product, and refused to pay PFC a warehousing allowance, as did Chevron, and (c) because PFC's purchases of Mobil lubrication product were in excess of the minimum quantities set forth in PFC's contracts with Mobil from April 1, 1973 to March 31, 1976.

The sales figures on the record, however, do not appear to support plaintiffs' new theories either. In their correspondence and briefs, the parties appear substantially in agreement as to the extent of PFC's lubricant purchases in 1972: plaintiffs state, referring to a Mobil internal memorandum of March 5, 1976 (labelled Exhibit 15), that the lubricant sales figures for 1971 and 1972 were approximately:

| Year | PFC's Lubricant Purchases From Mobil (gallons) | PFC's Mobil Purchases As Per Cent of Combined Mobil-Chevron |
|---|---|---|
| 1971 | – 0 – | – 0* – |
| 1972 | 125,000 | 47.0% |

Kannry letter of December 5, 1979 at 3. See also Defendants' Reply Memorandum at 12.

\* The Mobil memorandum (Exhibit 15) states that Mobil did not sell lubricants to the major contractors in the metropolitan area until 1971.

■ These figures thus again fail to show that PFC ever purchased Mobil lubricants exclusively, even during the expanded time periods mentioned in plaintiffs' brief. A record of threats and enforcement of minimum purchase requirements alone, with no showing that PFC was ever forced to deal exclusively in Mobil lubricants, can-

not support an exclusive dealing claim under Section 3, see this Court's opinion of June 29, 1978.

Nor do these figures show any significant correlation between the coercive acts or coercive power alleged and the pattern of actual sales from which it could be inferred that coercion influenced PFC's choice of lubrication products, see *American Mfctrs. Mutual Ins. Co. v. American Broadcasting*, 446 F.2d 1131, 1137 (2d Cir. 1971) *cert. denied*, 404 U.S. 1063, 92 S.Ct. 737, 30 L.Ed.2d 752 (1972); see also *Capital Temporaries v. Olsten*, 506 F.2d 658, 662 (2d Cir. 1974). In 1972, the year in which Mobil first sold to this market, PFC bought 47% of its lubrication products from Mobil, a significant increase from the previous year. But there is no corresponding allegation of coercive acts on the part of Mobil in that year (other than the minimum purchase requirement in PFC's 1970 contract with Mobil, which plaintiff Keahon states was not enforced until 1973, Keahon Affidavit at ¶ 14); nor of uniqueness of Mobil diesel fuel products in 1972, giving Mobil coercive power in that year, see Keahon Affidavit ¶ 13. Further, plaintiffs do not support Keahon's allegation that "international developments" gave Mobil coercive power in 1972 by reference to any specific development occurring in that year. Even if it is assumed that the "developments" referred to are the Yom Kippur War and the OPEC oil embargo, this allegation remains without support as to 1972, since the embargo was not imposed until October 19, 1973.

In 1973 and 1974, when, as plaintiffs now allege, coercive acts first occurred—minimum purchase requirements were first enforced and threats were first made—PFC's Mobil lubricant purchases rose 9 and 3 percentage points respectively, from 47% of combined Chevron-Mobil purchases to 55.93% and 59.08%. In 1975, there was a *decrease* of 40 percentage points in PFC's Mobil lubricant purchases; in 1976, there was a further decrease of 16 percentage points. In 1977, there was an increase of 19 percentage points in PFC's Mobil purchases. The foreclosure of other competitors after 1972 is thus small at best, and perhaps

insufficient for a tying claim; as the *American Mfctrs.* court stated:

"Tying arrangements are abhorred by the courts primarily because they foreclose a *substantial quantity* of business to competitors and extend preexisting economic power to new markets for no good justification. See *Fortner Enterprises v. United States Steel Corp.*, 394 U.S. 495, [89 S.Ct. 1252, 22 L.Ed.2d 495] . . . Foreclosure implies *actual exertion* of economic muscle, not a mere statement of bargaining terms which, if they should be enforced by market power, would then incorporate an illegal tie." *Id.* at 1137.

Moreover, even if coercion could be inferred during those years in which there was an increase in PFC's Mobil purchases as a percentage of its total lubricant purchases, the sales figures, including the comparable breakdown of PFC purchases of Chevron drums and pails, see Worster Affidavit, do not support an argument that PFC's Mobil purchases were "unwanted," as required for a tying claim, see *Capital Temporaries, supra*, merely because of package size; and plaintiffs have totally failed to specify what, if any, amounts of its Mobil product purchases in 1973 and thereafter were otherwise "unwanted" as compared to PFC's Mobil purchases in 1972.

■ In sum, plaintiffs' claims are unsupported, by their own admission, as to exclusivity; the initial version of the facts they present in support of their tying claim is, by their own admission, contrary to the record as it stands after discovery; their new tying theory fails to allege coercion in 1972, and, according to plaintiffs' own further factual allegations and defendants' uncontradicted assertions, there is insufficient factual support on the record as it now stands for an inference of significant foreclosure due to coerced purchases, or of purchase of unwanted product, from 1973 to 1977. Defendants' motion is therefore granted on these claims, subject to prompt renewal upon an offer of proof by plaintiffs connecting the legal theories asserted in the complaint with the underlying facts of this case.

**2. Section 1 Claims**

■ The factual allegations underlying plaintiffs' claims of exclusive dealing and tying arrangements consist entirely of actions taken by Mobil. Insofar as these actions (*e. g.*, threats) may be some evidence of a conspiracy among Unlimited, Rooney and Mobil to replace PFC as a Mobil distributor in order to secure a distribution monopoly for Unlimited and a supply monopoly for Mobil, these actions are related to a claim under Section 1, see part A, *supra*. They do not, however, state an independent cause of action for restraint of trade flowing from the alleged exclusive dealing or tying, first, because taken alone they do not describe the necessary combination or conspiracy, see this Court's Opinion of June 29, 1978, and second, because, as described above, plaintiffs have not supported their allegations that exclusivity or coerced purchase of unwanted lubricants actually occurred, see *Capital Temporaries, supra; American Mfctrs., supra.* Defendants' motion insofar as it relates to plaintiffs' Section 1 claim based solely on exclusive dealing or tying is therefore granted.

**D. Price Discrimination**

Plaintiffs have raised three claims of price discrimination under Section 2(a) of the Clayton Act, as amended by the Robinson-Patman Act, 15 U.S.C. § 13(a): price discrimination involving (1) differences in Mobil's charges for gas and diesel fuel to Unlimited and PFC; (2) differences between Mobil's charges for gas and diesel fuel to PFC and to gas and diesel fuel purchasers other than Unlimited; and (3) differences in credit terms Mobil offered to Unlimited and PFC.

*Gas and Diesel Fuel Pricing*

Defendants contend that plaintiffs' price discrimination claim cannot rest on differences between charges to PFC and Unlimited because Mobil's pricing policy was the same for these two customers, see Chambers Affidavit, so those differences which did occur were the result of billing errors only. Plaintiffs, in their Rule 9(g) statement, do not precisely deny this contention ("certain of Mobil's forms . . . indicate that PFC and Unlimited were both to be charged the same prices for product purchased at the same time"). Defendants further assert that those billing errors which did occur do not in themselves support a price discrimination claim, since they amounted to only $328.36 in Unlimited's favor, a sum which is *de minimis* in light of Mobil's total sales to PFC over the same period of close to $3,000,000. Plaintiffs maintain that the billing process resulted in a discrimination in Unlimited's favor of $1,413, but concede that Mobil's sales to PFC over the same period amounted to almost $3,000,000.

■ Even if plaintiffs' discrepancy figures are assumed to be true, defendants are correct in asserting that plaintiffs have failed to state a Section 2(a) claim on these facts: a difference of such a dollar amount and such a small per cent of total sales is *de minimis* as a matter of law. *Kohner v. Wechsler*, 477 F.2d 666, 667 (2d Cir. 1973) ($4,000 differential *de minimis*); *William Inglis & Sons v. ITT Continental Baking*, 461 F.Supp. 410, 421 (N.D.Calif.1978) (price differential of less than 1% of sales *de minimis*). See also *Craig v. Sun Oil Company of Pennsylvania*, 515 F.2d 221 (10th Cir. 1975), *cert. denied*, 429 U.S. 829, 97 S.Ct. 88, 50 L.Ed.2d 92 (1976) (summary judgment granted for defendant on Section 2(a) claim based on billing errors).

Plaintiffs have not supported by specific references to another, favored Mobil customer, and do not appear to be pressing, see Keahon Deposition Transcript of January 29, 1980 at 956–57, the further claim alleged in Count 9 of the Third Amended Complaint of price discrimination in gas and diesel sales in favor of customers other than defendant Unlimited.

Defendants' motion for summary judgment is therefore granted on both these issues.

*Credit Terms*

Defendants contend that differences in credit terms offered by Mobil to different customers cannot, as a matter of law, state

a claim under Section 2(a), citing, *inter alia, Lang's Bowlarama, Inc. v. AMF Corp.*, 377 F.Supp. 405 (D.R.I.1974), and *Diehl & Sons v. International Harvester*, 426 F.Supp. 110 (E.D.N.Y.1976).

Section 2(a) by its terms does not refer to discrimination in credit terms; rather, it proscribes discrimination "in price between different purchasers of commodities of like grade and quality . . . where the effect of such discrimination may be substantially to lessen competition." The final proviso in the subsection states that price differences based on responses to changing market conditions are not prohibited. Courts have generally held that credit term differences do not constitute price discrimination. In *Lang's Bowlarama, supra*, for instance, a defendant had applied different solutions to payment difficulties experienced by two franchises, granting one franchisee a more favorable debt retirement schedule than that granted to the plaintiff franchisee. The court granted the defendant franchisor's motion for summary judgment on the plaintiff's price discrimination claims under Section 2(a), on grounds that (1) in a case where different credit term enforcement was granted well after the initial commodity sales and lease agreements had been entered into, the differences were permitted under the final "changing market condition" proviso in Section 2(a); and, further, that (2) extension of different credit terms to different customers as an accommodation to business stresses or an exercise of business judgment was not price discrimination within the meaning of Section 2(a), *id.* at 409, *quoting Secatore's, Inc. v. Esso Standard Oil Co.*, 171 F.Supp. 665 (D.Mass.1959). In *Craig v. Sun Oil Co., supra*, the Tenth Circuit Court of Appeals held that discrimination in credit terms does not, as a matter of law, state a claim under Section 2(a) unless the discrimination is alleged to be extreme in nature or of great magnitude. *Id.* at 224 (citing, *inter alia, Lang's Bowlarama* ). In *Diehl, supra*, a case involving allegations that International Harvester Credit Corporation discriminated under Section 2(a) between two competing International Harvester dealers

by requiring plaintiffs' dealership to obtain an additional and expensive guarantee covering a large truck order, Judge Neaher granted summary judgment for defendant, stating that

"Decisions affecting the granting or withholding of credit involve many factors of business judgment and consequently it has been uniformly held that discrimination in credit terms is outside the [Robinson-Patman] Act's coverage. . . . This case certainly presents no basis for departing from those precedents." 426 F.Supp. at 122.

Certain other courts have suggested, however, that where the "extreme situation" possibility mentioned in *Craig, supra*, cannot be ruled out because the record is devoid of facts tending to show that differences in credit terms were a result of market conditions or financial ability of the purchasers, summary judgment on this issue is not appropriate. *Glowacki v. Borden*, 420 F.Supp. 348 (N.D.Ill.1976) (summary judgment denied as to the plaintiff's allegations of price discrimination resulting from granting one distributor a longer period to pay than that granted to the plaintiff); see also *Robbins Flooring, Inc. v. Federal Floors, Inc.*, 445 F.Supp. 4, 9 (E.D.Pa.1977) (Rule 12(b) motion denied).

In this case, the record on summary judgment shows that during the time periods covered by this aspect of plaintiffs' complaint, Unlimited was a new or relatively new, and growing, entrant into the distributor market. Defendants state, and plaintiffs do not deny, that during all relevant time periods, PFC's credit limit with Mobil was higher than Unlimited's—*i. e.*, that Mobil credit terms provided that PFC could purchase greater amounts of product on credit than could Unlimited, although Unlimited's credit limit was being revised upward during the same period (from an initial low figure of $5,000 to $20,000, then to $150,000 in 1976, see Peterson Affidavit). Under these circumstances, the alleged differences in credit policy and enforcement which plaintiffs cite—Mobil's asking for

only a limited personal guarantee from one of Unlimited's principals, and failure to request a guarantee from defendant Rooney, contrasted with the Unlimited personal guarantees Mobil required from PFC's principals; Mobil's permitting Unlimited to exceed its credit limit; and Mobil's failure to enforce its general 30-day payment policy as to Unlimited by cutting off Unlimited's access to product (except in one brief instance)—appear to fall within the range of credit practices found in *Craig, supra, Diehl, supra,* and *Lang's Bowlarama, supra* to lie outside the area of price discrimination prohibited by Section 2(a). Defendants' motion on this issue is, accordingly, granted.

**E. Claims of Price Discrimination Resulting from Misclassification under the Emergency Petroleum Allocation Act.**

In Count 9 of the Third Amended Complaint, plaintiffs allege that Mobil overcharged plaintiffs by, *inter alia,* misclassifying them as a consumer customer. Plaintiffs' affidavits supplement this allegation by describing such a misclassification as a violation of the EPAA. See, *e. g.,* Levine Affidavit.

Defendants maintain that, insofar as these allegations state a cause of action under Section 210 of the Economic Stabilization Act ("ESA"), 12 U.S.C. § 1904, note, as incorporated in the EPAA, the claim is time barred. They assert, relying on *Ashland Oil Co. v. Union Oil,* 567 F.2d 984 (TECA 1977), *cert. denied,* 435 U.S. 994, 98 S.Ct. 1644, 56 L.Ed.2d 83 (1978), that the applicable statute of limitations is the three-year period of Section 214(2) of the N.Y.C.P.L.R., claims under a statute; that the limitations period began to run in March, 1974 when Mobil reclassified PFC; and that the period had therefore expired before PFC filed its initial complaint on June 23, 1977. Plaintiffs do not contest that Section 214(2) is the correct state statute of limitations to be applied under *Ashland,* or that Mobil reclassified PFC in March 1974 but maintain that (1) the limitations period did not begin to run until May 31, 1977, the date on which PFC went

out of business and the date at which, plaintiffs allege, Mobil's price overcharges ceased; and (2) that even if the limitation period would otherwise have run, it is tolled as a matter of federal law under the rule laid down in *Ashland, supra,* that fraudulent concealment will extend a limitations period even though the time had not fully expired before the concealment was discovered, see 567 F.2d at 987, n. 4. Plaintiffs particularize this claim by pointing to an allegedly misleading exchange of letters with defendant Mobil in 1975 and 1976.

■ It appears that, insofar as plaintiffs' claims are based on misclassification alone, Mobil's overcharges ceased when Mobil reclassified plaintiff PFC in March 1974, and thus such claims would not, on their face, be timely. However, if Count 9 is read extremely generously, it might also be said to state a claim for other discriminatory practices in violation of the EPAA; and the Levine Affidavit suggests that, for instance, threats by Mobil to cut off PFC's supply of product would also be a violation of EPAA regulations entitling plaintiffs to sue under the EPAA. Plaintiffs allege elsewhere that such threats continued through May 1977. These claims would thus appear to be timely under Section 214(2). Moreover, the issue of whether or not tolling of the statute of limitations occurred on the misclassification claims due to fraudulent concealment appears to involve facts also relevant to plaintiffs' Section 1 and 2 claims, which may most appropriately be determined following trial. For the foregoing reasons, defendants' motion to dismiss based on the statute of limitations is denied as to plaintiffs' claims based on other discriminatory practices, and denied as to plaintiffs' misclassification claims without prejudice to renewal after trial.

**F. State Law Claims**

■ It is apparent that plaintiffs have alleged sufficient facts to state a claim for tortious interference with their contracts with their customers, *Terry v. Dairymen's League Cooperative Ass'n,* 2 A.D.2d 494, 157 N.Y.S.2d 71, 79–80 (2d Dept. 1956), and

that material issues of fact exist with respect to such claims. Defendants' motion on these claims is denied.

### G. Counterclaims

Finally, defendant Mobil has moved for summary judgment on its counterclaims against plaintiffs PFC, Keahon and Pretsch, for money owing for goods sold and delivered to PFC. Plaintiffs have asserted as affirmative defenses to these claims both the alleged antitrust violations by Mobil, which plaintiffs assert are related to Mobil's counterclaims, and thus form a valid defense under cases such as *Continental Wall Paper Co. v. Louis Voight & Sons*, 212 U.S. 227, 29 S.Ct. 280, 53 L.Ed. 486 (1909) and *Kelly v. Kosuga*, 358 U.S. 516, 79 S.Ct. 429, 3 L.Ed.2d 475 (1958), and the alleged Mobil violations of the EPAA, which plaintiffs assert also form a valid defense under cases such as *Berggren v. Sun Oil Co.*, 79 F.R.D. 87 (E.D.Wis.1978).

While the general rule is that claimed antitrust violations are not valid defenses to a claim for payment on a sale of goods if the contractual claim is based on a sale "which constitutes an intelligible economic transaction in itself," *Kelly, supra*, 358 U.S. at 520–21, 79 S.Ct. at 431–32; *Berggren, supra* ; see also *Walker v. M & A Auto*, 179–1 Trade Cases ¶ 62,664 (S.D.N.Y.1979), cases such as *Continental Wall Paper Co. v. Louis Voight & Sons, supra*, suggest that this rule will not be applied where a judgment of the court would be giving effect to conduct prohibited under the antitrust laws. *Berggren* suggests that the test under the EPAA is the same. 79 F.R.D. at 90.

There do appear to be certain issues of fact here with respect to the applicability of the antitrust defenses: if plaintiffs can successfully replead their tying claim, for instance, they may be able to show that Mobil charged higher prices for its lubricants than it could otherwise have done. Further, since the facts underlying both the applicability of these defenses to Mobil's counterclaims and the validity of the defenses if applicable will be brought out at trial, decision on Mobil's motion may appro-

priately be deferred until after trial. Accordingly, Mobil's motion for summary judgment on these claims is denied without prejudice to its renewal after trial.

To summarize: defendants' motion for summary judgment is denied as to plaintiffs' Section 1 claim based on conspiracy to eliminate plaintiff PFC as a distributor; as to plaintiffs' Section 2 claims; and as to plaintiffs' state law claims. Defendant Mobil's motion for summary judgment on its counterclaim is denied without prejudice to renewal after trial. Defendants' motion to dismiss plaintiffs' EPAA claims on statute of limitations grounds is denied without prejudice to renewal after trial as to those claims based on misclassification, and denied as to those claims based on threats. Defendants' motion for summary judgment is granted as to plaintiffs' Section 1 and 3 claims based on exclusive dealing and as to plaintiffs' Section 2(a) claims. Defendants' motion is granted with respect to plaintiffs' Section 1 and 3 claims based on tying subject to plaintiffs' immediate offer of proof on the Section 3 claim as to how PFC's Mobil purchases in 1973, 1974 and 1977 were "unwanted" by comparison to PFC's similar purchases in 1972.

In accordance with the Court's previous oral order, plaintiffs shall prepare and submit by Thursday, April 10, 1980, a pre-trial brief outlining the legal claims they intend to press at trial, consistent with this Opinion and Order, and the facts they intend to prove under each claim. Defendant Mobil shall prepare and submit on the same date a similar brief on its counterclaims.

SO ORDERED.