**Thomas A. VINCEL et al.,
Plaintiffs-Appellants,**

v.

**WHITE MOTOR CORPORATION and
Glenn F. Kommer,
Defendants-Appellees.**

**No. 621, Docket 74–2282.**

United States Court of Appeals,
Second Circuit.

Argued April 28, 1975.

Decided Aug. 11, 1975.

---

Myron S. Isaacs, New York City (Robert P. Levine, New York City, on the brief), for plaintiffs-appellants.

Lawrence W. Boes, New York City (Reavis & McGrath, Fred Taylor Isquith, New York City, on the brief), for defendants-appellees.

Before MOORE and MANSFIELD, Circuit Judges, and HOLDEN,* District Judge.

MOORE, Circuit Judge:

The plaintiffs-appellants are collectively the owners of 100% of the stock of Long Island Diamond Reo Truck Co., Inc. ("L.I. Reo"). They appeal from a final judgment dismissing their claims on the merits against the defendants-appellees White Motor Corporation ("White") and Glenn F. Kommer. The facts material to decision are as follows:

L. I. Reo is the successor corporation of a predecessor partnership and from 1958 to 1967 was a dealer of trucks manufactured by the Diamond and Reo truck divisions (eventually consolidated into a single division) of defendant White. Beginning in 1962, L.I. Reo's purchases of new and used trucks were financed through Universal C.I.T. Corp. ("C.I.T."). White also agreed to guarantee L.I. Reo's financial obligations to C.I.T. and to take over all of L.I. Reo's paper on demand if L.I. Reo defaulted in these obligations. White also agreed with L.I. Reo to finance L.I. Reo's substantial parts business on an open ledger running account.

When in November 1966 C.I.T. determined that L.I. Reo was "out of trust" with respect to some of the trucks floorplanned by C.I.T., i. e., L.I. Reo had sold the trucks without paying C.I.T. from the proceeds the amount of the indebtedness owed on the trucks, C.I.T. demanded that White honor its guarantee and purchase all of L.I. Reo's outstanding obligations. White complied, and as a result of White's payment to C.I.T. and certain other amounts owed to White in connection with the financing of L.I. Reo's parts business, in November 1966 the total indebtedness due from L.I. Reo to White approximated $200,000.

At this point, White and L.I. Reo negotiated and executed a financing agreement, dated November 23, 1966. Plaintiff Thomas Vincel, as president, executed the agreement for L.I. Reo, and he and plaintiffs Nuno Tardo and Breen also signed the agreement as shareholders. The agreement contained a mutual release of all existing claims and obligations except for those specified in the

* Chief Judge, United States District Court for the District of Vermont, sitting by designation.

agreement.[1] It also provided for the simultaneous execution of a note by L.I. Reo for $195,837.50, the amount then owed to White. The agreement outlined the manner of paying the note, and the note was to be secured by chattel mortgages or other security instruments on new or used trucks then or subsequently owned by L.I. Reo. Vincel also agreed personally to guarantee the note. In addition, the shareholder signatories agreed to place all shares of the voting stock of L.I. Reo and affiliated corporations owned by them in a voting trust, the terms of which were set out in a separate agreement.[2] The agreement designated defendant Glenn F. Kommer, Treasurer of White, as the Trustee. The voting trust agreement dated December 29, 1966, empowered the Trustee to appoint an individual acceptable to him as L.I. Reo's general manager. The voting trust agreement was to terminate upon the payment by L.I. Reo of the indebtedness specified in the financing agreement of November 23, 1966. Paragraph 5 also provided for the possible resignation of the Trustee and gave White the power to appoint a successor.

In February 1967 the Trustee Kommer proposed Samuel Antelis as general manager of L.I. Reo, and this appointment was approved by L.I. Reo's board of directors. Also about this time, L.I. Reo issued some $40,000 in checks to White in reduction of the indebtedness. These checks bounced, and this prompted the execution of another note, guaranteed by Vincel, in the amount of $42,739.56. On February 21, 1967, L.I. Reo and White signed a security agreement which essentially gave White a security interest in all trucks and parts owned or thereafter acquired by L.I. Reo. Thereunder, L.I. Reo could sell trucks and parts to retail customers but had to account for and pay the proceeds to White to the extent of any outstanding obligations. The security agreement provided that in the

event of default by L.I. Reo in the performance of any term of the November 23, 1966 financing agreement, the $195,-837.50 note, or the security instrument itself, White was authorized to enter L.I. Reo's premises, take possession of the secured property, and sell it at a public or private sale at which White itself might be a purchaser.

By mid-1967 L.I. Reo had defaulted by selling trucks without turning over the proceeds to White. White then on August 25, 1967 commenced an action in the New York Supreme Court against L.I. Reo and Vincel for breach of the agreements and conversion of the trucks. An order of attachment was obtained, pursuant to which White repossessed (in some cases with and in others without legal process) the vehicles subject to its security interest. L.I. Reo interposed several counterclaims and also moved to vacate the order of attachment. White countered with a motion to replevy parts in L.I. Reo's possession, which had also been attached. On December 11, 1967, the State court denied L.I. Reo's motion and granted White's crossmotion.

Meanwhile Kommer had resigned as Trustee, effective August 28, 1967 (about the time White commenced its action in State court). White had indicated that it did not intend to appoint a successor, and the voting trust agreement was terminated by the tender back of stock certificates to the depositing shareholders.

On December 21, 1967, shortly after the New York Supreme Court's decision respecting the attachment order, L.I. Reo filed a voluntary petition in bankruptcy in the United States District Court for the Eastern District of New York. White filed claims as a creditor amounting to $323,610.14. The Trustee in Bankruptcy asserted defenses and counterclaims in the amount of $3,000,-000, which were essentially the same as L.I. Reo's counterclaims previously lodged in the State court. They charged

---

1. The agreement explicitly excepted an October 28, 1965 note executed by L.I. Reo for $54,520.43, on which $18,180 was still outstanding.

2. The financing agreement specified that holders of at least 90% of each class of outstanding stock had to consent to the establishment of the voting trust, or White could, at its option, declare the financing agreement void.

in essence that White had driven L.I. Reo out of business.

With the approval of the Bankruptcy Referee after a hearing, and over the objection of the plaintiffs, White and the Trustee in Bankruptcy entered into an agreement compromising all claims. White agreed to pay the bankrupt estate the sum of $100,000. White's claim as a creditor was withdrawn, and the Trustee discontinued his counterclaim with prejudice. In addition, the Trustee and White agreed to stipulate to a discontinuance, with prejudice, of the then pending action in the State Supreme Court. The agreement further provided, however, that it would not affect "the action of White Motor Corporation against Thomas A. Vincel and Thomas A. Vincel's defenses and counterclaims to such action."[3] In short, therefore, all claims existing between L.I. Reo and White were settled upon payment by White of $100,000 and the other consideration stated in the agreement.[4] Claims between White and Vincel were thus preserved.

The plaintiffs commenced this action in 1969. Jurisdiction was based on diversity of citizenship and the Automobile Dealers' Franchise Act, 15 U.S.C. §§ 1221–1225. The original complaint and a subsequent amended complaint set forth six separate claims for relief: (1) that defendants violated their contractual duties to plaintiff under the two 1966 agreements; (2) that defendants violated their fiduciary duties to plaintiffs under the same agreements; (3) that defendants coerced plaintiffs into entering into those agreements; (4) that defendants and other officers of White conspired to combine White's three separate truck divisions in 1966 and to drive out of business the dealers of two of its divisions, including L.I. Reo, by unfair competition

and other anticompetitive practices;[5] (5) that defendants violated their duty to plaintiffs under the federal Automobile Dealers' Franchise Act (15 U.S.C. §§ 1221–25); and (6) that defendants violated their duty to plaintiffs under a similar New York statute N.Y. General Business Law § 197 (McKinney's Consol. Laws, c. 20, Supp. 1974–75).

Upon motion of the defendants, the district court first dismissed the plaintiffs' fourth claim in a comprehensive memorandum dated August 2, 1972, that summarized the background of the action and indicated "that any principle considered dispositive of the motion would necessarily have some application to the other causes of action as well." (194A). Plaintiffs were thereafter permitted to file an amended complaint, and the defendants moved for summary judgment. The district court granted the motion in a memorandum dated August 24, 1974.

### Discussion

The appropriate characterization of the events transpiring between November 1966 and August 1967 is a matter of some dispute. According to the plaintiffs, White coerced L.I. Reo into signing the November 23, 1966 financing agreement and then, having taken over the management of L.I. Reo, acted pursuant to a conspiracy with Kommer systematically to destroy that company's business. The defaults in 1967, plaintiffs contend, were caused by White's and Kommer's mismanagement of L.I. Reo and were purely a pretext to justify the effective termination of L.I. Reo's dealership.

The defendants, on the other hand, argue that they unselfishly sought, through the November 23, 1966 agreement and the forebearance of obligations

---

3. The action between Vincel and White was dismissed without prejudice on October 15, 1968.

4. As a result of the settlement, the bankrupt estate was able to pay all the claims of the secured creditors and 70% of the claims of the unsecured creditors. The shareholders apparently received nothing.

5. White also sold trucks manufactured by its White Truck Division. Plaintiffs alleged that White was itself selling its Diamond Reo trucks under the White division name in competition with L.I. Reo and that this was the motive for driving L.I. Reo out of business.

due from L.I. Reo, to salvage a dealership in poor financial condition. In spite of these efforts, the defendants argue, they were "duped". They contend that Vincel and others continued to manage the day-to-day affairs of L.I. Reo and were continually in default on L.I. Reo's obligations to White.

If decision turned on a determination of the accuracy of the differing accounts of the parties, summary judgment clearly would have been inappropriate in this case. But the district court held that the claims raised by the plaintiffs in actuality belonged to L.I. Reo as a corporate entity and therefore cannot properly be asserted by the plaintiffs in their own names and for their own accounts.[6] Any injury that White and Kommer may have inflicted was injury to L.I. Reo, and the plaintiffs suffered damage only derivatively by reason of the diminution in the value of their own apparently worthless stock. The claims raised in this action, it should be noted, were asserted by the Trustee in Bankruptcy against White and settled upon payment by White of $100,000 and release of its claims as a creditor. Thus, that the stockholders themselves received nothing by way of this settlement,[7] the money having been distributed to creditors of L.I. Reo, would be legally irrelevant.

■ *Niles v. New York Central & H. R. R.R.,* 176 N.Y. 119, 68 N.E. 142 (1903), reflects the general rule, applicable in New York and elsewhere, that where an injury is suffered by a corporation and the shareholders suffer solely through depreciation in the value of their stock, only the corporation itself, its receiver, if one has been appointed, or a stockholder suing derivatively in the name of the corporation may maintain an action against the wrongdoer. See also *Green v. Victor Talking Machine Co.,* 24 F.2d

378 (2d Cir.), *cert. denied,* 278 U.S. 602, 49 S.Ct. 9, 73 L.Ed. 530 (1928); N. Lattin, The Law of Corporations §§ 12, 102 (1971). The theory is generally that the corporate recovery restores the value of the stock. There are, of course, exceptions to this rule that stem from the nature of the wrong alleged or a special relationship between the suing shareholder and the defendant creating a duty, contractual or otherwise, other than that owed to the corporation. For example, in *General Rubber Co. v. Benedict,* 215 N.Y. 18, 109 N.E. 96 (1915), the court, per Judge Cardozo, upheld the claim of the plaintiff, the principal shareholder of a subsidiary corporation, against one of the plaintiff's directors. The general manager of the subsidiary had also become general manager of a company competing with the subsidiary. The defendant was a stockholder in this competitor and for his own personal gain acquiesced in and approved of the general manager's diversion of funds belonging to the subsidiary for the benefit of the competitor. The court recognized that the subsidiary corporation itself might have an action against the defendant but also upheld the claim of the plaintiff as principal shareholder for the diminished value of its shares. The court emphasized that as a director of the plaintiff, the defendant owed "the duty of good faith and vigilance in the preservation of its property." 215 N.Y. at 21, 109 N.E. at 97. Thus, on the basis of this relationship and the duty flowing therefrom the court permitted the plaintiff shareholder to maintain its suit. To the same effect are *Matter of Auditore,* 249 N.Y. 335, 164 N.E. 242 (1928) (wrongdoer who looted a corporation, some of the stock of which was owned by his deceased brother's estate, was the administrator of the estate and hence liable apart from his role as officer and

---

**6.** Judge Dooling held that:

"The alleged wrongful acts were related to the conduct of the L.I. Reo business, allegedly ruined that business, and only in that way damaged plaintiffs through their ownership interests in the business. The breaches of duty alleged are *not* breaches of any duties

undertaken in either of the agreements relied upon but allegedly rapacious acts as a creditor insisting on the letter of its bond and taking advantage of non-existent or insubstantial defaults." (406A)

**7.** See note 4 *supra.*

director of the corporation), *Cutler v. Fitch,* 231 App.Div. 8, 246 N.Y.S. 28 (4th Dept. 1930) (wrongdoers charged with mismanagement were pledgees of plaintiff's stock) and *Ritchie v. McMullen,* 79 F. 522 (6th Cir.), *cert. denied,* 168 U.S. 710, 18 S.Ct. 945, 42 L.Ed. 1212 (1897) (defendants were pledgees of plaintiff shareholder's stock and through calculated acts of mismanagement sought to diminish the value of plaintiff's stock so as to be able to acquire it cheaply for themselves).

There are also situations in which an action by or on behalf of the corporation provides no remedy to an injured shareholder. This occurs, for example, in a "freeze out" operation when directors purposely carry on the business of a corporation so as to reduce the value of the corporate stock. A plaintiff, having then sold at a depressed price, no longer owns any part of the corporation and would derive no benefit from a corporate recovery. Under these circumstances, courts have permitted the former shareholder to sue the wrongdoers in his or her own name. *Von Au v. Magenheimer,* 126 App.Div. 257, 110 N.Y.S. 629 (2d Dept. 1908), *aff'd* 196 N.Y. 510, 89 N.E. 1114 (1909). See also *Green v. Victor Talking Machine Co., supra,* 24 F.2d at 381, *Ritchie v. McMullen, supra.*

The plaintiffs seek to convince this court that this suit falls within one of the exceptions to the rule set out in *Niles, supra.* They freely acknowledge that L.I. Reo could, and indeed did, sue to remedy the allegedly unlawful acts of White and Kommer. However, they contend that the defendants violated contractual, fiduciary, and statutory obligations, running to the plaintiffs as shareholders and (in the case of six of the plaintiffs) employees of L.I. Reo.

■ At the outset, we deal briefly with the claim that certain of these plaintiffs are entitled to pursue this action by reason of their status as former employees of L.I. Reo. Examination of the financing and voting trust agreements discloses that they nowhere even mention the status of the plaintiffs as employees much less purport to preserve it. In fact, any inference is directly to the contrary, namely, that some of the plaintiffs might depart the employ of L.I. Reo, since the financing agreement expressly prohibited the signatory shareholders from engaging in any business competing with L.I. Reo as long as any indebtedness specified in the agreement remained unpaid. Furthermore, none of the plaintiffs had separate contracts of employment with L.I. Reo with which the defendants might have interfered. *Cf. Israel v. Wood Dolson Co.,* 1 N.Y.2d 116, 151 N.Y.S.2d 1, 134 N.E.2d 97 (1956); *Terry v. Dairymen's League Coop. Assn.,* 2 A.D.2d 494, 157 N.Y.S.2d 71 (3d Dept. 1956). They apparently served at the pleasure of the board of directors and the shareholders. Any expectation they might have had in continued employment at L.I. Reo derived from their position as owners of the corporation, and they cannot avoid any disabilities to their action as shareholders simply by asserting collateral interests as employees.

■ The statutory claims of the plaintiffs must also fail because any such claims belong to the corporation. A stockholder may not bring an action in his own right for anti-trust violations causing corporate injury. *Schaffer v. Universal Rundle Corp.,* 397 F.2d 893, 896 (5th Cir. 1968); *Ash v. International Business Machines, Inc.,* 353 F.2d 491, 493–94 (3d Cir. 1965), *cert. denied,* 384 U.S. 927, 86 S.Ct. 1446, 16 L.Ed.2d 531 (1966); *Walker Distributing Co. v. Lucky Lager Brewing Co.,* 323 F.2d 1, 10 (9th Cir. 1963), *cert. denied,* 385 U.S. 976, 87 S.Ct. 507, 17 L.Ed.2d 438 (1966); *Bookout v. Schine Chain Theatres, Inc.,* 253 F.2d 292 (2d Cir. 1958); *Ames v. American Telephone & Telegraph Co.,* 166 Fed. 820 (C.C.D.Mass.1909); *Cf. Green v. Victor Talking Machine Co.,* 24 F.2d 387 (2d Cir.), *cert. denied,* 278 U.S. 602, 49 S.Ct. 9, 73 L.Ed. 530 (1928).

■ The Automobile Dealers' Franchise Act, 15 U.S.C. §§ 1221–25, gives "automobile dealer[s]" a right of action to redress unfair actions committed by a manufacturer in connection with a franchise agreement. The term "automobile

dealer" is defined as "any person, partnership, corporation, association, or other form of business enterprise . . . operating under the terms of a franchise and engaged in the sale or distribution of passenger cars, trucks, or station wagons." 15 U.S.C. § 1221(c). When, as here, a dealership is doing business in corporate form, the statute contains no hint that it intends a departure from the established principle that the locus of the right of action is the corporation. Although *Kavanaugh v. Ford Motor Co.,* 353 F.2d 710 (7th Cir. 1965), relied upon by plaintiffs, upheld the right of the sole individual shareholder (and the operator) of a dealership to sue in his own name, the circumstances in that case which induced the court to disregard the corporate entity were compelling. The defendant Ford Motor Co. owned all the voting stock of the franchise and controlled the board of directors. To deny Kavanaugh the right to sue would have had the effect of negating the protective features of the Act altogether. The court observed: "It is inconceivable that [Ford], owning all the voting stock of the dealership corporation and being in complete control of it, would ever seek the protection afforded by the statute." 353 F.2d at 717. *York Chrysler-Plymouth, Inc. v. Chrysler Credit Corp.,* 447 F.2d 786 (5th Cir. 1971), permitted shareholders to join the suit of the corporation as individuals.[8]

■ Here, unlike *Kavanaugh,* there was no practical disability to L.I. Reo asserting its claims against White. Vincel, Tardo, and Breen at all times were on the board of directors, and any control that White may have had through the voting trust agreement terminated in August 1967 with the resignation of Kommer as Trustee. And this is not a case like *York,* in which the shareholders are joined with the corporation in a single action. The claims of L.I. Reo against White were settled by the Trustee in Bankruptcy.[9] Although the counterclaims made by the Trustee did not mention the Automobile Dealers' Franchise Act by name, the counterclaim in essence alleged that White's action caused a premature termination of the business, the identical thrust of a claim under the Act. And the settlement agreement approved by the Bankruptcy Referee explicitly relinquished any claim of L.I. Reo under the Act by releasing White "from all claims, rights, demands or causes of action . . . from the beginning of the world to the day of the date of [the] agreement." Under these circumstances, there is no justification for allowing the shareholders of L.I. Reo to maintain an action in their own name.[10]

■ Turning now to the asserted bases of defendants' contractual and fiduciary obligations to the shareholders, namely the November 23, 1966 financing agreement and the voting trust agreement, we find that they are not helpful to the plaintiffs. As the District Court noted, the "undertakings of the [financing] agreement of November 23, 1966 are primarily undertakings that run to and not from White." White's only undertaking in the agreement having to do

8. See also *Lewis v. Chrysler Motors Corp.,* 456 F.2d 605 (8th Cir. 1972).

9. Judge Dooling held:

"Such a settlement concludes the assertion of the same claim for redress of the same wrongs damaging the corporate business when the stockholders of the bankrupt seeks to assert in their own interest that same claim for the same damages inflicted on the bankrupt corporation, whether the stockholders simply mistakenly regard the corporate claim for damages as their own, or rely on a supposed undertaking with them by the alleged wrongdoers that the latter would not inflict those wrongs on the corporation. The claim satisfied by the trustee's settlement is the claim sought to be asserted in the present amended complaint for damage allegedly wrongfully inflicted on the corporate business by White and Kommer, and that claim can have but a single satisfaction, the one exacted by the trustee." (410A, 411A)

10. The plaintiffs-appellants do not contend that their claim as automobile dealers asserted under the New York statute, New York General Business Law § 197 (McKinney's Supp. 1974–75), should be treated any differently than their claim based on the federal Act, and accordingly, this provision is also unavailing as a source for a claim asserted in their individual names.

with the shareholders was to release all previous claims against them in return for a mutual release by the shareholders of claims against White. Nowhere else does the financing agreement express any duty running to the shareholders. All other provisions were for the benefit of White, namely, the agreement by the shareholders to deposit their shares in a voting trust and the personal guarantee of the $195,000 note by Vincel.

With respect to the voting trust agreement, the plaintiffs attempt to show a breach of specific provisions. Taking the facts as the plaintiffs allege them to be, their contention does not stand up. Paragraph 4 of the voting trust agreement provided in part:

> "*Dissolution etc.* The Trustee agrees that during the term of this Agreement, he will not cause any of the corporations to be dissolved or totally or partially liquidated without having received the prior written consent of the signatories."

Although the Trustee never voted his shares to dissolve or liquidate L.I. Reo—or for that matter, voted the shares at all—the plaintiffs argue that by causing the corporation to be managed in such a way as to render inevitable the eventual bankruptcy of the corporation, the Trustee breached paragraph 4.

■ With due consideration to the plaintiffs' arguments we are unable to perceive paragraph 4 as any thing other than a restriction on the Trustee's power to vote the stock held in trust. "Dissolution" and "liquidation" are terms of art. Dissolution is a means of doing away with the corporate entity. Liquidation refers generally to the conversion of all or part of the assets of a corporation into monetary assets. Neither is the equivalent of insolvency, which is essentially what the plaintiffs allege that the Trustee caused here. Both can be accomplished through a vote of the shareholders. *See* New York Business Corporation Law §§ 909, 1001–02 (McKinney's Consol.Laws, c. 4, 1963). The clear purpose of paragraph 4 was to prohibit the Trustee from taking these steps without

the shareholders' consent; the clause was not meant to be a general prohibition against mismanagement.

■ The plaintiffs also seek to premise liability on paragraph 14 of the voting trust agreement:

> "*No liability.* Neither the Trustee nor [the general manager] . . . shall be liable by reason of any manner or thing in any way arising out of or in relation to this Agreement except for such loss or damage as the Voting Trust Certificate holders may suffer by reason of his wilful misfeasance or gross negligence. . . ."

However, this clause is exculpatory in nature and intended to protect the Trustee from liability resulting from merely negligent performance of his duties as trustee, such as the ill-advised voting of shares. The paragraph can provide no independent basis for liability.

■ Although there was no breach of a specific provision of the voting trust agreement, this conclusion does not put an end to the matter. The Trustee unquestionably was a fiduciary, owing a strict duty to the depositing shareholders and, in a somewhat different sense to those minority shareholders, who, although not actually depositing their shares, consented to the voting trust agreement and signed it. *See* N. Lattin, The Law of Corporations § 92 (1971). However, the duty owed to the shareholders is in this case indistinguishable from the duty owed to the corporation by reason of the Trustee's having taken effective control of the corporation. Virtually all of the shareholders were parties to the voting trust agreement. The Trustee did not undertake a fiduciary commitment to, for example, a particular stockholder holding a minority share of a corporation. His was an obligation to deal responsibly with all those persons owning any interest in L.I. Reo and cannot, therefore, be separated from his duty to the corporation itself. As a consequence, this case is distinguishable from *General Rubber Co., supra, Matter of Auditore, supra* and others in which

there was a distinct duty owed to particular shareholders and is rather in the class controlled by *Niles, supra.*

A final word is appropriate. That the Trustee in Bankruptcy was without power to settle the claims of individual shareholders, see 4A Collier on Bankruptcy § 70.04 at 52–53 & n. 13 (14th ed. 1971), and in fact negotiated a settlement which preserved Vincel's claims against White, is in itself of no significance unless there are separate and distinct individual claims to be preserved. We think that the district court correctly ruled that the plaintiffs have alleged no such claims, and the judgment of the district court is therefore affirmed.

In summary, we believe, as did Judge Dooling, that "the issues 'belonged' to L.I. Reo, related to alleged wrongs having their impact solely on its property and business, and were disposed of by its trustee in bankruptcy for a very substantial consideration." (419A)