**In the Matter of RICK MICHAELS FORD, INC., an Illinois corporation, Debtor.**

**RICK MICHAELS FORD, INC., Plaintiff,**

v.

**FORD MOTOR COMPANY, a Delaware corporation, Defendant.**

**Bankruptcy Nos. 80 B 02734, 80 A 830.**

United States Bankruptcy Court, N. D. Illinois, E. D.

Dec. 17, 1980.

Nicholas G. Dozoryst, II, Chicago, Ill., for plaintiff, Rick Michaels Ford, Inc.

Messrs. W. Donald McSweeney, Aaron J. Kramer, Richard M. Bendix, Jr., Chicago, Ill., Newell Blair, CRR Pub. Co., Washington, D. C., for defendant, Ford Motor Co.

## OPINION AND ORDER

RICHARD L. MERRICK, Bankruptcy Judge.

This cause came on to be heard upon the motion of Ford Motor Company (hereinafter "Ford") to dismiss the complaint of Rick Michaels Ford, Inc. (hereinafter "Rick Michaels") for specific performance of a Ford SALES AND SERVICE AGREE- MENT (hereinafter "the AGREEMENT"), for declaratory relief and other relief. Prior to its going out of business shortly after the filing of its Chapter 11 petition, Rick Michaels had been a dealer of Ford Motor vehicles and trucks in Arlington Heights, Illinois. At the time of its demise Rick Michaels had a substantial inventory of new automobiles (hereinafter "VEHICLES") and also parts (hereinafter "GENUINE PARTS"), both of which had been purchased from Ford.

Considerably over-simplified the AGREE- MENT provided that upon termination of the franchise Ford would repurchase the VEHICLES and the GENUINE PARTS from Rick Michaels at a figure very close to cost (for purposes of convenience we shall adopt the figure used by counsel in their arguments of 98% of cost) provided that Rick Michaels execute a general release. Rick Michaels wishes to compel Ford to pay the 98% price without receiving a general release. While the issues were being briefed, Ford agreed to repurchase the VE- HICLES at 98% of cost without receipt of the general release but also without prejudice to its contention that it had no obligation to do so and that it continued to have no obligation to repurchase the GENUINE PARTS without receipt of a general release. Consequently, the only issue remaining open is whether or not Ford may be compelled to purchase the inventory of GENUINE PARTS at 98% of cost without receipt of a general release.

In their arguments and discussions the attorneys talked as if there is only one feasible outlet for Rick Michaels' to dispose of its inventory of GENUINE PARTS in the event that Ford does not repurchase them. That outlet would be other Ford dealers who maintain their own inventories of GENUINE PARTS and have a continuing demand for them. It was suggested that the other Ford dealers would pay a price equal to about 25% of Rick Michaels' cost. Consequently, the loss to Rick Michaels if Ford does not repurchase the inventory at 98% of cost is the difference between 98% and 25%, or 73% of cost. Rick

Michaels' cost of its inventory of GENU-INE PARTS is not a part of the pleadings so that there is no way for the Court to determine whether or not 73% of X is a large figure in relation to other dollar amounts which are in dispute between the two parties.

Rick Michaels lists seven claims which it has against Ford which it would have to release if the contract provision should be upheld to require a release before the inventory can be forced back to Ford, all as alphabetical subsections to Paragraph 17 of the complaint:

(a) $14,238.66 representing a 1% rebate on 1980 cars sold;

(b) $7,616.37 representing an unpaid rebate of 5% for 1979 model cars not sold in current model year;

(c) $57,000 for warranty work and parts;

(d) Incentive program reimbursements of $6,000;

(e) This is an unliquidated claim for damages resulting from Ford's delivery of additional vehicles after being advised not to do so on January 13, 1980;

(f) This is an unliquidated claim for damages resulting from Ford's delivery of vehicles in large lots at a time when Rick Michaels could not absorb them;

(g) This is an unliquidated claim for damages resulting from Ford's refusal to let Rick Michaels sell to a dealer in Alaska 48 vehicles which it was unable to sell locally.

We presume that Rick Michaels added together items 17(a) through 17(d) for a total of $84,855.03 and added to that some estimate of the probable recovery under items 17(e) through 17(g). Thus it was in a position to place a rough dollar value on the worth of the release, both to itself and to Ford. Before getting into the specifics of the particular general release at issue in the instant case it may be observed as a thing of which a court might take judicial notice that usually when parties settle a dispute or a series of disputes, they settle all aspects of the disputes at one time; there is a single comprehensive settlement agreement with no loose ends.

The core of Rick Michaels' complaint is Paragraph 31, which reads as follows:

"31. The portion of the SALES & SERVICE AGREEMENT requiring the Plaintiff to give its general release to the Defendant prior to repurchase is manifestly unfair and oppressive, in that it allows the Defendant to engage in unfair practices toward the Plaintiff from which it will be released in order for the plaintiff to effectively liquidate its inventory of vehicles and GENUINE PARTS upon termination of its franchise."

For the purposes of this decision the Motion to Dismiss admits all facts properly pleaded but does not admit conclusions of law.[1] Paragraph 31 does not allege, nor does any other paragraph allege, what are the "unfair practices" in which Ford is engaged and from which Ford would be released. To bring the point home we will state a hypothetical situation. Suppose the complaint had stated that in the past there existed a particular model Ford automobile which was in very high demand and short supply; and that Ford would deliver that particular model only if the dealer also bought large quantities of GENUINE PARTS. We may presume that such tie-in sales would be against public policy, and that it also might be against public policy to require a release of potential causes of action based upon the tie-in sales before enforcing other aspects of the SALES AND SERVICE AGREEMENT.

That case is not before us. There is no allegation here that anything which Ford did or required Rick Michaels to do was against public policy. Paragraph 31 of the complaint speaks only of "unfair practices", which is a conclusion and does not make any specific allegations as to fact or deeds which might be "unfair" or unlawful. Thus the issue before this Court is on a broad general basis of what constitutes unfairness and what the consequences of it should be. Is it unfair that Ford's SERVICE AND

---

1. *See* 2A Moore's Federal Practice, '' 12.08 at 2267 (2d ed. 1980), for cases.

SALES AGREEMENT is a printed form which the dealer may accept or reject but may not alter nor amend? Is it unfair that a giant worldwide corporation should be able to compel a small suburban Middle Western corporation to abide by all of the terms of a written contract? Questions of this nature may be considered abstractly or specifically, based upon logic and precedent. Usually the precedent requires reasoning by analogy, but in the instant case we have the benefit of a number of decisions which interpret a Ford SERVICE AND SALES AGREEMENT --- earlier versions of the document which is before us in the instant case.

The first case to be considered is the *Fabert Motors* case[2], which is controlling to the extent that it is applicable because it is a Seventh Circuit case. One important difference between the *Fabert Motors* case and the instant case is that in the former case Fabert Motors already had signed the general release and had received somewhat in excess of $86,000 in payments from Ford respecting claims, some of what apparently were similar to the specific claims of $84,-855.03 of Rick Michaels in the instant case.

In spite of having signed a general release Fabert Motors sued Ford on two grounds:

(a) violation of anti-trust laws for coercing Fabert Motors to take on an Edsel dealership in order to retain its Lincoln-Mercury dealership, and

(b) violation of the Automobile Dealers' Franchise Act (15 U.S.C. §§ 1221–1225) on substantially the same grounds.

Treble damages and attorneys' fees in the amount of $1,100,000 were sought in the anti-trust count and damages of $300,000 under the Franchise Act count.

Another distinction between the *Fabert Motors* case and the instant case is that there it was alleged that the unlawful tie-in of the Edsel dealership constituted an illegal coercion which forced Fabert Motors to resign its Lincoln-Mercury dealership. In the instant case there is no allegation that Ford forced the termination of the AGREEMENT by Rick Michaels. The allegation respecting termination is contained in paragraph 7 of the complaint, quoted here in full:

"7. That on March 18, 1980, the Plaintiff resigned its Ford franchise SALES AND SERVICE AGREEMENT and related agreements with FORD MOTOR COMPANY."

*Three Rivers Motor Company v. The Ford Motor Company*[3], is also a treble damage anti-trust suit by a dealer against the manufacturer focusing on the same general release requirement of a standard SALES AND SERVICE AGREEMENT substantially similar to that at issue in the instant case. Among other things, the opinion pointed out an interesting aspect of the development of the standard franchise agreement. Prior to 1967 Ford had the option to buy back the vehicles and inventory of parts; after 1967 the repurchase was compulsory if the dealer had executed a general release. The general release actually used in the *Three Rivers* case was extremely broad. The Court related[4] that it was similar to one described by Judge Goodrich in a precedent case:[5]

"The document of release, which sounds as though it had been taken from an old form book, is as broad as all out of doors and typical of the wasteful use of words in the Engligh language in which lawyers sometimes indulge."

We are not presently confronted with the language of a release because the cessation of the relationship between the parties has not developed to the point where the actual language of the release has been cast. Paragraph 23 of the Agreement provides in part:

2. *Fabert Motors, Inc. v. Ford Motor Co.*, 355 F.2d 888 (7th Cir. 1966).

3. *Three Rivers Motor Co. v. Ford Motor Co.*, 522 F.2d 885 (3d Cir. 1975).

4. *Id.* at 896, n. 26.

5. *Dura Electric Lamp Co. v. Westinghouse Electric Corp.*, 249 F.2d 5 (3d Cir. 1957).

"Simultaneously with the receipt of any benefits so elected or demanded, the Dealer shall execute and deliver to the Company a general release with exceptions, as above described, satisfactory to the Company."

There are several basic factual differences between the instant case and the *Three Rivers* case. First is the fact that in the *Three Rivers* case the dealer had received $540,000 in exchange for the release. In the instant case no money has passed yet, and no release has been given.

Second is the fact that the terms of the release were known in the *Three Rivers* case, and they are not here. The Court can postulate provisions in a general release which would be contrary to the law. Under such circumstances a Court might reform the Agreement to provide that Ford might not insist upon the illegal limitation, whether illegal restraints which would cause the dealer to commit an unlawful act or would cause it to release Ford from liability for any unlawful acts which Ford had committed against it. The instant complaint does not allege that any illegal act has been committed by Ford which the dealer will be required to condone by the giving of its general release. The Court refuses to fan the flames of speculation by prophesying what its reactions might be if the pleadings were different from what they are.

■ Third, it would be futile at this juncture for the Court to reform the AGREEMENT. Rather obviously the provision of the AGREEMENT that the general release shall be "satisfactory to the Company" means that the conditions or terms imposed by Ford must be reasonable and not arbitrary or whimsical. There is nothing factual in the pleadings to suggest that Ford would act arbitrarily, only the conclusion that Ford is unfair.

Paragraph 23 of the agreement which requires that "the Dealer shall execute and deliver to the Company a general release with exceptions, as described above, satisfactory to the Company." The exceptions which are described above are:

1. Subparagraph 19(f) relates to the delivery after termination of the AGREEMENT of vehicles which were on order at the date of termination and provides that the vehicles shall be delivered notwithstanding the termination. The general release does not relieve Ford of the responsibility to make delivery of the vehicles.

2. Paragraph 21 provides that the general release does not relieve Ford of its responsibility to purchase
   (a) new VEHICLES,
   (b) GENUINE PARTS
   (c) SIGNS, and
   (d) Special tools.

3. Paragraph 22 provides that Ford in various ways will help the dealer to sell his physical facilities and will finance the carrying of leased premises for a period of time and that Ford's obligation is not waived by the general release.

Rick Michaels makes the argument that because there already are three exceptions to the generality of the release the Court should make additional exceptions as a matter of fairness. What that argument fails to recognize is that the three mentioned paragraphs recite obligations of Ford which are beneficial to the dealer and which continue in spite of the broad release but also are beneficial to Ford with respect to continuing the operation of a dealership under new ownership. Stated differently, the described and enumerated exceptions to the release arise in areas where Ford and the dealer have a common interest of continuity and not in areas which are essentially adversarial.

■ This Court has found not to be persuasive the argument that it should create an exception of one kind because the AGREEMENT contained several exceptions of a different kind, or to be specific, that the Court should rule that where the AGREEMENT was unfair to the Dealer the Court should eliminate the requirement of the AGREEMENT that the Dealer accept

the burdens of the AGREEMENT with its benefits; that is, release Ford generally if it wishes to compel Ford to repurchase the inventory at 98% of cost.

*Walker v. Ford Motor Company*[6], 241 F.Supp. 526 (E.D.Tenn.1965) relied on by the plaintiff, dealt with the standard 1955 SERVICE AND SALES AGREEMENT, which apparently compelled Ford to repurchase the inventory of parts and did not contain a counterbalancing requirement that the dealer should execute a general release in order to avail himself of the repurchase proviso. Ford refused, nevertheless, to repurchase the parts without a general release. Plaintiffs liquidated the parts in other ways and sued Ford for the difference, which was determined by the Court to be payable in the amount of $36,157.72. The *Walker* case is interesting as showing the developmental background of the general release requirement, but it has little precedential value because it dealt with an Agreement which did not require a release. Ford attempted to require the dealer to give a release before it would settle. In effect, the Court held that such a unilateral imposition of a new condition to the contract was not acceptable.

■ Bankruptcy Rule 112 provides that Rule 12 of the Federal Rules of Civil Procedure applies to Bankruptcy Proceedings. Although Rule 12 does not express it in so many words, a motion under Rule 12(b)(6) and Bankruptcy Rule 712(b) to dismiss a complaint as failing to state a claim for which relief may be granted admits for the purposes of the motion all matters which are well pleaded.[7] We find that no facts have been pleaded which, taken to be true, will support a finding against Ford Motor Company.

Paragraph 29 states that the requirement that a general release be executed prior to the repurchase of the GENUINE PARTS "creates an extreme hardship on the Plaintiff." Taking that allegation as being true, there are two answers to it:

(a) it is the bargain which Rick Michaels made when it entered into the Agreement; and

(b) Rick Michaels has the option of proceeding directly to cause the inventory of GENUINE PARTS to be repurchased by FORD after the general release, or Rick Michaels can sell the inventory by auction at whatever price it can obtain. If Rick Michaels gives the general release, it waives whatever rights it may have to the liquidated claims of $86,000 and to the unliquidated claims. If Rick Michaels refuses to give the general release, it will receive less for the inventory but will retain its right to prosecute all other claims which it may have against Ford of whatever nature.

■ The question which arises is whether it is unconscionable to require Rick Michaels to make a choice of this nature. The unconscionability doctrine, which has received increased attention because of Uniform Commercial Code § 2–302,[8] is intended to prevent oppression and unfair surprise and not to relieve a party of the effect of a bad bargain.[9]

■ There has been no allegation of procedural unconscionability, that is, lack of knowledge or understanding of the contract terms or lack of voluntariness resulting from a great inequality in the parties' relative bargaining power. Nor has there been an allegation of substantive inequality, that is, that the contract is so one-sided as to be oppressive.[10] Rick Michaels was not de-

6. *Walker v. Ford Motor Co.*, 241 F.Supp. 526 (E.D.Tenn.1965).

7. *See* note 1, *supra.*

8. 1979 Ill.Rev.Stat., ch. 26, § 2–302.

9. *Id.* at Official Comment 1; *Bank of Indiana, N. A. v. Holyfield*, 476 F.Supp. 104 (S.D.Miss.

1979); *Campbell Soup Co. v. Wentz*, 172 F.2d 80 (3d Cir. 1948).

10. For a discussion of procedural and substantive unconscionability, see Leff, *Unconscionability and the Code—The Emperor's New Clause*, 115 U.Pa.L.Rev. 485 (1967).

prived of all of the benefits of the contract nor was it left without a remedy. The posture of Rick Michaels under the contract is that it has to make a choice. It can go either of two ways, each of which has some apparent advantages and disadvantages. There is not the absence of meaningful choice which would constitute unconscionability. Rather than that there is a difficult choice, either give up the resale of GENUINE PARTS at 98% of cost, or give up liquidated claims of $86,000 plus other unliquidated claims.

The elements of lack of understanding by the economically weaker party as a consequence of being poorly educated, or unsophisticated in business affairs, or not represented by counsel are not alleged to have been present here so as to bring the instant case within the purview of the *Bank of Indiana*[11] case or *Johnson v. Mobil Oil Corp.*[12]

The debtor may not accept the benefits of the Agreement (receiving 98% of its cost for its inventory of GENUINE PARTS) without also having to accept the burdens (issuing a general release for all other claims or potential claims). *Schokbeton Industries, Inc. v. Schokbeton Products Corp.*[13] The fact that Rick Michaels will have to give up one financial benefit in order to gain another does not establish economic coercion, even though Ford presumably is infinitely better capitalized than Rick Michaels. *Fabert Motors, Inc. v. Ford Motor Co., supra,* also established that where the economic conditions of the market place caused a small company to contract with a large company, it did not establish duress, either at the time of the execution of the AGREEMENT or at the time of the execution of the general release.

A somewhat different approach, but one which is equally applicable, was taken in *S. E. Rondon Company v. Atlantic Richfield Company*[14], where the emphasis was on the fact that the issuance of the release is one side of the settlement coin. As with any other settlement, the relative financial condition of the parties may play a very important part in both the fact of a resettlement and the terms of a settlement.

In the instant case there are no allegations respecting the circumstances under which Rick Michaels initially executed the AGREEMENT. In the absence of any proof or allegations to the contrary, we must conclude that the original execution of the AGREEMENT was unobjectionable. In the absence of any proof or allegations that the execution of a general release by Rick Michaels would release Ford from liability for conduct which is contrary to public policy, we must conclude that the execution of a general release to Ford is a settlement of all outstanding disputes and that it is immaterial that Rick Michaels' weak financial posture puts it into a position where it might not be able to strike as beneficial a bargain for itself as it could have done if it had been stronger. It is clear that at the present time Rick Michaels is being represented by able and conscientious counsel. There is no proof nor any allegation that the conditions were otherwise when the AGREEMENT was executed, and we must conclude that Rick Michaels was aware of the conditions of the AGREEMENT when it was signed. The fact that the AGREEMENT was a printed standard form which Rick Michaels had no power to alter is immaterial. Rick Michaels, as far as we can determine, was under no obligation to execute the AGREEMENT and presumably felt that some economic benefits would flow to it from being a Ford dealer and that executing the form AGREEMENT was the only method by which it could become a Ford dealer.

The Complaint of Rick Michaels is dismissed with prejudice.

11. *Bank of Indiana, N. A. v. Holyfield,* 476 F.Supp. 104 (S.D.Miss.1979).

12. *Johnson v. Mobil Oil Corp.,* 415 F.Supp. 264 (E.D.Mich.1976).

13. *Schokbeton Industries, Inc. v. Schokbeton Products Corp.,* 466 F.2d 171, 177 (5th Cir. 1971).

14. *S. E. Rondon Co. v. Atlantic Richfield Co.,* 288 F.Supp. 879 (C.D.Cal.1968).