**SCHMITT–NORTON FORD, INC., a Minnesota Corporation, and Robert C. Schmitt and John Norton, Plaintiffs,**

v.

**FORD MOTOR COMPANY, a Delaware Corporation, Defendant.**

No. Civ. 4–81–191.

United States District Court,
D. Minnesota,
Fourth Division.

Oct. 21, 1981.

Timothy D. Kelly, Stuurmans & Kelly, P.A., Minneapolis, Minn., for plaintiffs.

Peter Dorsey and Robert Bayer, Dorsey, Windhorst, Hannaford, Whitney & Halladay, Minneapolis, Minn., for defendant.

MacLAUGHLIN, District Judge.

This matter is before the Court on cross motions by the parties. The defendant has moved to dismiss all claims or, alternatively, for summary judgment. The plaintiffs have moved for an order striking certain defenses or, alternatively, for summary judgment. The defendant's motion for summary judgment will be granted.

## FACTS

In determining whether to grant a summary judgment motion, a court must give the nonmoving party the benefit of all reasonable inferences and view the facts in the light most favorable to the opposing party. *Pfizer, Inc. v. International Rectifier Corp.,* 538 F.2d 180 (8th Cir. 1976), *cert. denied,* 429 U.S. 1040, 97 S.Ct. 738, 50 L.Ed.2d 751 (1977). In evaluating the defendant's motion for summary judgment the Court must assume the facts in the light most favorable to the plaintiffs.

Plaintiffs Robert C. Schmitt (Schmitt) and John Norton (Norton) were the sole, equal shareholders and corporate officers in plaintiff Schmitt-Norton Ford, Inc. In 1961 Schmitt and Norton entered into a standard form Ford Sales & Service Agreement (the Agreement) with defendant Ford Motor Company (Ford) authorizing Southdale Ford to sell and service new Ford vehicles at an Edina, Minnesota location. The Agreement established a franchise and set out the rights and obligations of the parties. In reliance on this agreement the plaintiffs entered into a 20-year lease for the Edina location. The lease was not automatically renewable and was set to expire in 1982.

In 1972, Ford began pressuring Schmitt and Norton to move their dealership to a larger location so that it could accept more inventory and provide more customer service. Ford exerted several kinds of pressure on the plaintiffs, including a statement that it would not renew the dealership agreement unless the plaintiffs moved, a refusal to allow plaintiffs to postpone moving until their Edina lease expired in 1982, and a refusal to allow the plaintiffs to sell the dealership with a reasonable expectation of transferring the franchise to their buyer. In addition, Ford failed to act on plaintiffs' repeated requests for assistance in selling the dealership but instead proposed a liquidation sale with plaintiffs retaining all the risks of repossession of vehicles. Plaintiffs allege that Ford misrepresented the relocation costs and projected profits at a new location. After plaintiffs moved to a larger location in May, 1979,

Ford failed to supply plaintiffs with the popular smaller vehicles that it had promised as additional incentive for the plaintiffs' move.

In September 1979 after losing more than $400,000 of the business' net worth, Schmitt and Norton resigned their Ford dealership and stopped doing business in October 1979. On November 13, 1979, Schmitt and Norton entered into a Stock Purchase and Sale Agreement (Purchase Agreement) in which they agreed to sell all their stock in Schmitt-Norton Ford, Inc. to G.W. Palmer Investments, Inc. The Purchase Agreement specified that the actual sale and delivery of stock would occur on the closing date (which occurred on December 28, 1979), that the corporation would not amend its Articles of Incorporation or by-laws before that date, that Schmitt and Norton would hire Gerald W. Palmer (Palmer) as the general manager of the corporation until the closing date, and that Palmer would be entitled to a refund for all his payments if any of the Purchase Agreement's conditions were not met prior to the closing and he decided not to close. On November 27, 1979, Palmer, claiming to be the sole shareholder of Schmitt-Norton Ford, Inc. despite the fact that the closing for the stock sale had not yet occurred, stated in a writing in lieu of a special meeting of the corporate shareholders that he was changing the corporation's name, amending the corporation's articles of incorporation, and electing himself and his wife the sole corporate directors. On that same date in a writing in lieu of a special meeting of the board of directors, Palmer and his wife elected themselves the sole corporate officers of Schmitt-Norton Ford, Inc.

Schmitt and Norton signed a general release of all corporate and individual claims against Ford on December 26, 1979. They signed only after consulting with an attorney of their choice and only after receiving advice from their attorney concerning the release and its effect. On the face of the release, they indicated that they were signing in their corporate officer capacity and not as individuals. Plaintiffs now claim that they were not in fact corporate officers at the time of the execution of the release and that they owned no stock at that time. However, the closing of plaintiffs' sale to Palmer occurred on December 28, 1979, two days after they signed the general release. The plaintiffs allege that Ford coerced them into signing the release by refusing to pay for returned parts until they signed the release.

Ford's efforts to force the dealership to move to a new location and Ford's subsequent treatment of the dealership after its move form the basis of the plaintiffs' complaint. The plaintiffs allege six separate statutory and common law causes of action, including violation of the Automobile Dealers' Day in Court Act, 15 U.S.C. § 1221 *et seq.* The Court need not address these causes of action because they are barred by the plaintiffs' signing of the general release.

DISCUSSION

 Courts generally engage in a presumption in favor of the validity of releases because the law favors settlement of disputes. *Jeffries v. Gillitzer*, 302 Minn. 402, 225 N.W.2d 17, 20 (1975); *Dobbins v. Kawasaki Motors Corp.*, 362 F.Supp. 54, 56–57 (D.Ore.1973). But a release is valid only if a party has intentionally executed it and received full consideration for his or her claim. *Couillard v. Charles T. Miller Hospital, Inc.*, 253 Minn. 418, 92 N.W.2d 96 (1958). Sufficient consideration exists only if the person executing the release receives something of value to which the person had no previous right. *Burns v. Northern Pac. Ry. Co.*, 134 F.2d 766 (8th Cir. 1943). In addition to the factor of sufficient consideration, courts have considered the following factors in determining the validity of releases: 1) the presence or absence of legal counsel of plaintiff's choice before and at the time of settlement, *Schmidt v. Smith*, 299 Minn. 103, 216 N.W.2d 669, 673 (1974); 2) the language of the release itself and whether the plaintiff was permitted to change language in the release, *Schmidt*, 216 N.W.2d at 673, *Coester v. H.H.B. Company*, 447 F.Supp. 372 (D.S.D.1978); 3) evi-

dence of inequitable conduct by the defendant in obtaining the release, *Coester*, 447 F.Supp. at 378; 4) the presence or absence of fraud or misrepresentation in obtaining the release, *Coester*, 447 F.Supp. at 378; 5) the existence of economic coercion in obtaining the release, *Oskey Gasoline and Oil Company, Inc. v. Continental Oil Company*, 534 F.2d 1281 (8th Cir. 1976); and 6) evidence that the release is against public policy, *Fabert Motors, Inc. v. Ford Motor Company*, 355 F.2d 888 (7th Cir. 1966).

### 1. *Consideration.*

Schmitt-Norton Ford, Inc. received consideration for its release because Ford repurchased new vehicles, parts, and other items from the corporation as required under the Ford Sales & Service Agreement, Paragraph 21. Ford claims that it paid current wholesale prices listed for the parts not the actual wholesale price the plaintiffs had paid. Schmitt and Norton claim that they were paid the same price they had paid originally for the items and thus the repurchase was merely a "wash transaction." It is not clear how much more, if anything, Schmitt-Norton Ford, Inc. received for the repurchased parts than it had paid for them originally. Schmitt and Norton, however, admit that they could have chosen to attempt to sell these items themselves for their salvage value but that they elected instead to resell them at their wholesale cost to Ford. Included among the repurchased items were sixty-four 1979 model vehicles that Ford repurchased at the plaintiffs' wholesale cost even though the plaintiffs signed the release after the introduction of the 1980 model year. After repurchasing these vehicles, Ford had to offer cash payments and a five per cent discount to other dealers in order for them to accept

the older model vehicles as inventory. Even though Schmitt and Norton claim the repurchase was a "wash transaction," they ignore the fact that Ford paid a premium for the items in return for their signing the release and that they chose to take advantage of Ford's willingness to do so.

■ The key factor in determining the validity of the release is not the amount of consideration the person giving the release receives, unless it is merely a token amount, but rather whether the person received something for which he was not previously entitled. Courts have held it is a jury question if there are issues of whether consideration was given at all or whether a token amount is sufficient consideration for the release. *Maynard v. Durham & Southern Railway Co.*, 365 U.S. 160, 162–163, 81 S.Ct. 561, 562–563, 5 L.Ed.2d 486 (1961). In this case Schmitt-Norton Ford, Inc. received consideration because Ford repurchased significant numbers of items. In addition, since Ford had no legal obligation to repurchase the items but did so at a price above that the plaintiffs would have received from other purchasers, the consideration satisfies the minimum requirement and thus does not raise a material issue of fact.[1] *See In re Rick Michaels Ford, Inc.*, 7 B.R. 763 (Bkrtcy.N.D.Ill.1980) (stating that plaintiff had not been totally deprived of the benefit of a release contract similar to the present one that provided Ford would repurchase parts at 98 percent of the plaintiff's cost. The court refused to hold the contract unconscionable and stated plaintiff could not accept benefits and refuse burdens under the release. *Id.* at 768–769).

### 2. *Legal Advice.*

■ The plaintiffs received legal advice concerning the release and its effect. The

---

1. Plaintiffs claim that the defendant breached a fiduciary duty under the Automobile Dealers' Day in Court Act, 15 U.S.C. § 1221 *et seq.* by giving inadequate consideration for the release; the defendant denies such a fiduciary duty even exists. The plaintiffs also claim that the defendant breached a fiduciary duty arising from their franchise relationship with the defendant. *See Arnott v. American Oil Company*, 609 F.2d 873 (8th Cir. 1979), *cert. denied* 446 U.S. 918,

100 S.Ct. 1852, 64 L.Ed.2d 272 (1980). The defendant has attempted to distinguish *Arnott* from the present case. Because the Court has found that the defendant's consideration meets the minimum threshold required, the Court finds it unnecessary to analyze whether a fiduciary duty existed in this case and whether such a duty was breached. The consideration was adequate even if Ford owed the plaintiffs a fiduciary duty.

plaintiffs' attorney indicated that he had advised his clients concerning the release beginning five months before they actually signed the release. In addition, the plaintiffs' attorney discussed the release with Schmitt and Norton at the time of the signing, advised them not to sign as individuals, and witnessed the signing of the release. Despite this legal advice over an extended period of time, the plaintiffs claim they did not understand fully the significance of the release. Unilateral mistake concerning the effect of a release is not a basis for setting it aside unless there is evidence that the other party obtained the release by fraud, misrepresentation, or other inequitable conduct. *Coester v. H.H.B. Company*, 447 F.Supp. 372, 378 (D.S.D. 1978).

### 3. *Inequitable Conduct, Fraud, and Misrepresentation.*

■ Plaintiffs claim that defendant's actions inducing them to move the dealership were inequitable and that, therefore, the release should be held to be invalid. The Court finds that the plaintiffs have failed to establish that the defendant's alleged acts, even if taken as true, caused the plaintiffs to sign the release. Assuming as plaintiffs claim that the defendant misrepresented relocation costs and the projected profitability of the new location, threatened termination or non-renewal of the franchise agreement, and shipped the dealership unpopular vehicles, the plaintiffs have failed to show how these acts caused them to sign the release. The defendant's acts may have caused the plaintiffs to move to a new location but they did not directly cause the plaintiffs to sign the release; plaintiffs could have refused to sign the release and sued for damages. The plaintiffs do not claim they were misled about the nature of what they were signing but merely that they did not fully understand its implications, which is at most a claim of unilateral mistake not of fraud, misrepresentation, or inequitable conduct.

### 4. *Economic Coercion.*

■ The plaintiffs have similar causation problems concerning their argument that the defendant's economic coercion caused them to sign the release. In the Eighth Circuit a party challenging a release on the basis of economic coercion or duress must establish three elements: 1) that one side involuntarily accepted the terms of the other, 2) that circumstances permitted no other alternative, and 3) that those circumstances were the result of coercive acts of the opposite party. Whether the particular facts are sufficient to constitute a defense of duress is a matter for the court to determine. *Oskey Gasoline & Oil Co., Inc. v. Continental Oil Co.*, 534 F.2d 1281, 1286 (8th Cir. 1976). The plaintiffs have failed to establish elements two and three: that they had no alternative but to sign the release in order to receive compensation for the items and that the defendant caused this situation. Plaintiff Norton admitted he and Schmitt could have sold the items themselves and not had Ford repurchase them. Even assuming that at the time they signed the release Schmitt and Norton had no alternative, this came about because of the way they structured the sale to Palmer not because of Ford's actions. At the time they signed the release, the plaintiffs had a legal remedy of refusing to sign the release and suing Ford for damages.

### 5. *Public Policy.*

■ The defendant argues the release does not violate public policy and thus should be upheld. Plaintiffs respond that it violates both the federal policies embodied in the Automobile Dealers' Day in Court Act (the Act) and the state policies embodied in the Minnesota Franchise Act. The defendant is correct as a matter of law; the release does not violate public policy under either federal or state law. In *Fabert Motors, Inc. v. Ford Motor Company*, 355 F.2d 888, 890–891 (7th Cir. 1966), the Circuit Court concluded such general releases were not against public policy if they were not obtained by unlawful coercion. See also *Three Rivers Motors Co. v. Ford Motor Co.*,

522 F.2d 885, 892 (3d Cir. 1975), which, contrary to plaintiffs' assertion, does briefly discuss whether a release violates federal policy and states in dicta that it does not.

■ The legislative history of the Act suggests its purpose was to provide a new federal cause of action and to provide a counterweight for one-sided franchise contracts. H.R. No. 2850, 84th Cong., 2d Sess., *reprinted in* [1956] U.S.Code Cong. & Admin.News 4596. The legislative history is silent on the issue of releases, but the instant release differs from some of the types of actions that the House Committee said the Act was designed to discourage. Unlike some of the manufacturers' practices mentioned by the Committee, the signing of the release was not a requirement for obtaining the franchise but was a separate transaction that was entered into only after plaintiffs received additional consideration. The Act gives the plaintiff a right to bring an action for lack of good faith performance of the franchise agreement but does not prevent a plaintiff from intentionally waiving the right to bring such a suit.

The plaintiffs' arguments based on state policy also are unpersuasive. Plaintiffs' heavy reliance on a recent Minnesota Supreme Court case in interpreting the Minnesota Franchise Act is misplaced. The Minnesota Supreme Court in *Chase Manhattan Bank N.A. v. Clusiau Sales & Rental, Inc.*, 308 N.W.2d 490 (Minn.1981), struck down a waiver of defense clause contained in a lease that was ruled part of a franchise agreement because the waiver would undercut the remedial nature of the statute by preventing suits even before a cause of action arose. 308 N.W.2d at 494. The release at issue in the present case, however, did not prevent suit until after the cause of action arose and only after the plaintiffs signed a separate contract and received additional consideration for the contract. Unlike the waiver of defense provision in *Clusiau*, the franchise agreement itself did not prevent suit.

Plaintiffs assert that the general release violates state policy as embodied in Minnesota Franchise Act, Minn.Stat. § 80C.14, which prohibits a person from engaging in "unfair or inequitable" practices. The defendant asserts that plaintiffs' argument is flawed because it assumes that no consideration was provided for the release. The state regulations adopted under the statute clearly allow good faith settlement of disputes: "Nothing herein shall be construed to limit or prohibit good faith settlements of disputes when such settlements are voluntarily entered into between the parties." Minn.Reg.S.Div. 1718 (1976). Nothing in the provisions cited by the plaintiffs prevents settlement for past causes of action; the statute is aimed at prospective waivers of rights. Thus, since the defendant gave the plaintiffs consideration and the release was not a prospective waiver of rights, the release is not invalid as a matter of state public policy under the Minnesota Franchise Act.

### 6. *Validity of Plaintiffs' Signatures.*

■ In addition to attacking the validity of the release itself, the plaintiffs also assert their signatures on the release were invalid because they signed it merely in their corporate officer capacity and they were no longer officers in the corporation since they had sold all their assets a month before signing the release. The defendant asserts that the sale was not final because the closing agreement was not executed until after the release was signed. The plaintiffs' own documents establish that they signed the Purchase Agreement on November 13, 1979, but did not sign the Closing Agreement until December 28, 1979, or two days after signing the release. The Court finds that there is no material issue of fact concerning the plaintiffs' status as corporate officers. The Purchase Agreement's terms clearly spell out the legal relationship between plaintiffs and the new buyer during the interim period until the closing date. The plaintiffs retained all rights and liabilities of ownership and corporate capacity until the closing date; Palmer, the new buyer, was merely the manager of the dealership during this interim period. Thus, there is no question that

the plaintiffs were corporate officers at the time they signed the release and that the plaintiffs had the authority to release all corporate claims.[2]

■ The Court finds no merit in Schmitt and Norton's contention that they retained personal causes of action even if they released all corporate claims. Schmitt and Norton did not enter the franchise agreement in their individual capacities but rather they formed a corporation, Schmitt-Norton Ford, Inc., and it entered into the dealership agreement with Ford. From 1969 through 1979, Schmitt and Norton enjoyed the full benefits and protections of operating as a corporate entity. After many years of availing themselves of such protections, Schmitt and Norton cannot now assert that they, as individuals, were the real parties in interest to the franchise agreement. The cause of action, if any, belonged to the corporation and it could have brought suit any time before Schmitt and Norton signed the release. Yet at no time during that period did the corporation seek such redress.

In addition, the Court finds that Schmitt and Norton have no statutory right to bring a cause of action as individuals. They assert that they have standing because they are practically and legally the only parties who can assert a cause of action. They rely on the Act, 15 U.S.C. § 1221 *et seq.*[3] and two cases interpreting this statute.

■ The Act gives automobile dealers a federal right of action to redress a manufacturer's unfair actions in performing or terminating a franchise. The statute defines dealers as "any person, partnership, corporation, association, or other form of business enterprise ... operating under the terms of a franchise and engaged in the sale or distribution of passenger cars, trucks, or station wagons." 15 U.S.C. § 1221(c). If the dealer named in the franchise is a corporation, as it is in this case, the general rule is that only the corporation itself, its receiver, or stockholder suing derivatively may maintain an action under the statute. *Vincel v. White Motor Corp.*, 521 F.2d 1113, 1118 (2d Cir. 1975); *Brady v. General Motors Corp.*, 1978 Trade Cases ¶ 62,209 (citing *Vincel* approvingly).

2. The plaintiffs submitted documents purporting to show that Palmer, as sole shareholder of Schmitt-Norton Ford, Inc., had elected himself and his wife the sole directors of the corporation on November 27, 1979, and that they in turn had elected themselves the sole corporate officers on that same date. The Court finds that these documents were without legal effect since Palmer had not yet purchased the stock in Schmitt-Norton Ford, Inc., but had merely agreed to purchase the stock. Because Schmitt and Norton remained the sole shareholders and officers of Schmitt-Norton Ford, Inc. until the closing date for the stock sale, which was December 28, 1979, they had the authority to release the corporation's claims.

Even if Schmitt and Norton were no longer corporate officers but were merely shareholders, they should be estopped from denying their authority to sign the release under principles of apparent agency or agency by estoppel. *See, e. g., Grummitt v. Sturgeon Bay Winter Sports Club*, 197 F.Supp. 455, 458 (E.D.Wisc.1961) (stating that apparent agency is established if three elements exist: 1) acts by the agent or principal justifying belief in the agency, 2) knowledge of such acts by the party sought to be charged, and 3) reasonable reliance by the charging party). In the present case Schmitt and Norton claim that they knew they were no longer corporate officers but signed the release anyway in order to receive benefits from Ford. Certainly, Ford was justified in relying on their representations since Ford had dealt with them in the past as corporate officers, and Ford had no reason to suspect that they lacked authority to sign the release even though Ford was aware of the negotiations for the sale of the dealership. Because Schmitt-Norton Ford, Inc. accepted the benefits from Schmitt and Norton's representations that they had authority to sign the release, the corporation is estopped from later denying they had such authority. *See S.S. Silberblatt, Inc. v. Seaboard Surety Company*, 417 F.2d 1043, 1049 (1969) (noting that company cannot be allowed to hold out person as agent and then disavow responsibility for his dealings).

3. Schmitt and Norton also assert that they have standing as individuals to bring this lawsuit because the corporation's new owner assigned all the corporation's claims arising from the operation of the dealership on or before November 15, 1979, to the plaintiffs as individuals on September 26, 1980. Since the Court has found that the corporation released all its claims on December 26, 1979, the attempted assignment was ineffective.

The plaintiffs correctly assert that the determination of whether an individual has standing under the Act must be made on a clear and well developed record. The Eighth Circuit reversed a summary judgment determination that an individual did not have standing under the Act in *Lewis v. Chrysler Motors Corp.*, 456 F.2d 605 (8th Cir. 1972), because the lower court did not have affidavits and testimony to aid in its determination. In the present case the parties have submitted numerous depositions and affidavits; therefore, the Court has an appropriate record upon which to make a summary judgment determination. In *Brady v. General Motors Corp.*, 1978 Trade Cases ¶ 62,209, Judge Edward J. Devitt granted summary judgment on the same issue on the basis of similar materials. *See also Moorehead v. General Motors Corp.*, 442 F.Supp. 873, 875 (E.D.Pa.1977) (discussing *Lewis'* standard and holding that it is met by submission of depositions and exhibits).

In the Court's opinion plaintiffs have failed to establish a legitimate reason for making an exception to the general rule of *Vincel.* Thus, any cause of action in this case belongs to the plaintiff corporation. However, the corporation released all its claims on December 26, 1979. Thus, no material issue of fact remains concerning the right of the plaintiffs to bring this suit either as individuals or as a corporation. Because the Court finds that the general release is valid and bars all claims, the Court finds it unnecessary to analyze the plaintiffs' other claims. The Court will grant the defendant's motion for summary judgment. The Court will deny the plaintiffs' motion to strike or, alternatively, for partial summary judgment because the Court's grant of the defendant's motion renders the plaintiffs' motion moot. Accordingly,

IT IS ORDERED:

1. That the plaintiffs' motion to strike certain defenses or, alternatively, for partial summary judgment be and hereby is denied.

2. That the defendant's motion for summary judgment be and hereby is granted.

LET JUDGMENT BE ENTERED ACCORDINGLY.